**Muriel May SCOTT, née Plummer, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 502, Docket 27826.

United States Court of Appeals Second Circuit.

Argued May 27, 1965.

Decided July 14, 1965.

Stanley Mailman, Fried & Mailman, New York City (Benjamin Pesikoff, New York City, on the brief), for petitioner.

James G. Greilsheimer, Sp. Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, Francis J. Lyons, Sp. Asst. U. S. Atty., on the brief), for respondent.

Before LUMBARD, Chief Judge, and SMITH and KAUFMAN, Circuit Judges.

KAUFMAN, Circuit Judge:

Mrs. Muriel May Scott, *née* Plummer, petitions for review of a Board of Immigration Appeals order directing that she be deported as an alien excludable at the time of entry, 8 U.S.C. § 1251(a) (1), on the ground that she was not a "nonquota immigrant" as specified in her visa, 8 U.S.C. § 1181(a) (3). Although granted voluntary departure as a matter of administrative discretion, Mrs. Scott was deemed ineligible for relief under Section 241(f) of the Immigration Act, 8 U.S.C. § 1251(f), which provides that the statutory provisions relating to deportation of aliens excludable for procuring entry by fraud or misrepresentation do not apply "to an alien otherwise admissible at the time of entry who is the spouse, parent, or a child of a United States citizen or of an alien lawfully admitted for permanent residence."

The agency found that the petitioner was not a nonquota immigrant because her pre-entry marriage to an American citizen was void for immigration purposes and that she was ineligible for relief because not "otherwise admissible" under the oversubscribed quota of the country from which she came—Jamaica, British West Indies. Finding no error in the dual determinations of deportability and ineligibility for relief, we dismiss the petition for review.

On December 24, 1957, in Jamaica, Muriel May Plummer, a native of that colony and a British subject, was formally married to Edward Lee Scott, a citizen of the United States. Since marriage to an American citizen confers nonquota status upon the alien spouse, Section 101 (a) (27) (A), 8 U.S.C. § 1101(a) (27) (A), Mrs. Scott applied for and obtained a nonquota immigrant visa, and was later admitted to this country for permanent residence.

Some four years thereafter, in January 1962, the Immigration and Naturalization Service commenced deportation proceedings against Mrs. Scott, serving her with an order to show cause why she was not deportable as an alien excludable at entry because she was not a nonquota immigrant as specified in her visa. The supporting papers alleged that the petitioner had entered into a marriage ceremony with a United States citizen "solely for the purpose of qualifying for a nonquota immigrant visa, * * * without the intention of establishing a bona fide marital relationship with him," and that such a relationship had not in fact been established.

At a hearing before a Special Inquiry Officer, the following undisputed facts were established on the basis of testimony by Mrs. Scott, her sister Mrs. Gloria Slade, and prior sworn statements by both. Mrs. Slade, who herself had entered the United States through a sham marriage, arranged with one Dudley Goulbourne for Muriel to be married to

an American citizen. Goulbourne, who was to be paid $500 for his services,[1] travelled to the British crown colony with Jerome Lloyd, who served as Scott's proxy in the marriage ceremony performed with Muriel in Kingston, Jamaica, on December 24, 1957.[2] Muriel had neither seen nor communicated with Scott or Lloyd before the ceremony and she concededly saw neither thereafter. Indeed, she did not know the identity of the intended proxy bridegroom until his arrival in Jamaica. Furthermore, it was admitted that Muriel never intended to live with Scott, that the marriage never was consummated, and that Muriel has lived continuously with her sister since arriving in the United States, receiving no support whatever from the man who was her husband in name only. Rather, the sole purpose of the marriage was to qualify Muriel for a nonquota immigrant visa as the spouse of an American citizen.

Based on these concessions, the Special Inquiry Officer found more than ample support in the record for the Service's contention that the marriage—contracted solely for immigration purposes with no intention of establishing a bona fide conjugal relationship—could not confer nonquota status upon Mrs. Scott. The Board of Immigration Appeals sustained the finding that Mrs. Scott was deportable because she was not, as her visa specified, a nonquota immigrant. The Board also rejected the alien's claim that she was entitled to relief under Section 241(f), which would apply if (1) she was the parent of a United States citizen, (2) her excludability was based on having procured a visa or entry by fraud or misrepresentation, and (3) she was "otherwise admissible" at the time of her entry. The first prerequisite was met by

the alien because a child was born to Mrs. Scott, out of wedlock, in New York City in 1962.[3] But, even if Mrs. Scott had been found deportable for fraud in obtaining entry into this country, rather than for not being a nonquota immigrant as specified, she would be nonetheless *not* "otherwise admissible at the time of entry" "because she was actually a quota immigrant and entered as a nonquota immigrant." And, as the Board's opinion indicated, entry as a quota immigrant from Jamaica was impossible because at the time of Mrs. Scott's entry the British subquota for the crown colony, Section 202(c), 8 U.S.C. § 1152(c), was greatly oversubscribed. The Board therefore ordered Mrs. Scott deported to Jamaica, although it endorsed the Special Inquiry Officer's grant of the privilege of voluntary departure. This petition for review, pursuant to Section 106 of the Immigration Act, 8 U.S.C. (1964 ed.) § 1105a, followed.

## I.

Mrs. Scott contends initially that she is not subject to deportation because the Government failed to allege or prove the predicate for a finding of nonquota status—an invalid marriage. She claims, in essence, that because the marriage was not shown to be void under Jamaican law, the place where it was performed, it must be presumed valid. But the critical question, in our view, is not whether the purely ceremonial marriage was void in the abstract; rather, the issue is whether Mrs. Scott was the "spouse" of an American citizen and thus admissible for permanent residence as a nonquota immigrant. We agree with the Board of Immigration Appeals' conclusion that a marriage contracted solely to

---

1. Goulbourne, who received only $200 of the promised fee, subsequently pleaded guilty to charges of unlawfully encouraging and inducing the entry into the United States of aliens not lawfully entitled to enter.

2. Arguably, the Plummer-Scott marriage, with Lloyd as proxy, was void from the inception, for at the time of the ceremony Lloyd allegedly was already married. The

Service did not, however, introduce direct evidence on this point at the deportation hearing and therefore does not press the matter.

3. The father of the child is neither Scott nor Lloyd. The natural mother of an illegitimate child qualifies as a parent under the statutory definitions, Section 101 (b) (1) and (2), 8 U.S.C. § 1101(b) (1) and (2).

circumvent the immigration laws, with no intention that the parties will ever live together, does not suffice to make the alien the "spouse" of a United States citizen.

Petitioner's argument overlooks the lesson taught by the Supreme Court in Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953): When questioned in this context, the marriage relationship must be judged in terms of the immigration statutes rather than the law of the place where the empty ceremony was performed. The Lutwak case was concerned with charges of criminal conspiracy to defraud the Government by obtaining the illegal entry of three aliens under the War Brides Act as the spouses of honorably discharged veterans. The Court treated the validity of the marriages under foreign law as immaterial because "[t]he common understanding of a marriage, which Congress must have had in mind when it made provision for 'alien *spouses*' in the War Brides Act, is that the two parties have undertaken to establish a life together and assume certain duties and obligations." 344 U.S. at 611, 73 S.Ct. at 486. Certainly Congress did not establish nonquota status "to provide aliens with an easy means of circumventing the quota system by fake marriages in which neither of the parties ever intended to enter into the marital relationship." Ibid. See also United States v. Rubenstein, 151 F.2d 915 (2 Cir.), cert. denied, 326 U.S. 766, 66 S.Ct. 168, 90 L.Ed. 462 (1945); Matter of M——, 8 I. & N. Dec. 217 (1958).

■ The same functional approach— a concern with the legal consequences of the marriage for immigration purposes— applies here, *a fortiori*, because we are not concerned with a criminal statute that must be strictly construed. See, e. g., Yates v. United States, 354 U.S. 298, 303–311, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); United States v. Wiltberger, 18 U.S. (5 Wheat.) 76, 95–96, 5 L.Ed. 37 (1820). As we said in United States v. Diogo, 320 F.2d 898, 905 (2 Cir. 1963), "Congress may adopt a federal standard of *bona fides* for the limited

purpose of denying immigration priorities to persons whose marriages do not meet that standard" as embodied in the legislative understanding of the term "spouse" in the Immigration Act. Since there is no doubt that Mrs. Scott's sham marriage did not create a bona fide husband-wife relationship, we hold that she was not the "spouse" of an American citizen under the Immigration Act and, therefore, not entitled to nonquota status.

## II.

Petitioner contends, alternatively that she is eligible for relief from deportation under Section 241(f), which, as we have indicated, would apply to her as the parent of a United States citizen if (a) she is being deported for having procured her entry into this country by fraud or misrepresentation and (b) she was "otherwise admissible at the time of entry." Technically, of course, Mrs. Scott is being deported simply because she was not a "nonquota immigrant" as specified in her visa. But the Government in effect concedes that she meets the first prerequisite noted above since she was excludable at the time of entry for having procured her visa by fraud or misrepresentation, 8 U.S.C. § 1182(a) (19). Indeed, the Board of Immigration Appeals, in construing the predecessor of Section 241 (f)—Section 7 of the Act of September 11, 1957, 71 Stat. 641, 8 U.S.C. (1958 ed.) § 1251a—held that the exculpatory provision comprehends aliens not precisely within its terms, stating that "the section of the law under which the charge [for deportability] is laid is immaterial." Matter of S——, 7 I. & N. Dec. 715, 717 (1958).

The interesting question, therefore, is whether, even if Mrs. Scott had been (or was in effect) found deportable for having procured her visa by fraud or misrepresentation, she was "otherwise admissible at the time of entry." She contends that once the element of fraud is eliminated, no other provision of the Immigration Act makes her inadmissible because the phrase "otherwise admissible at the time of entry" in Section 241(f) refers only to qualitative grounds of in-

admissibility, as set forth in Section 212, 8 U.S.C. § 1182 (e. g., aliens who are feeble-minded, drug addicts, or who have been convicted of crimes involving moral turpitude), and not to quantitative or documentary standards tied to the quota system. We do not believe that the distinction we are asked to draw is supported by the statutory language when viewed in its proper context, the legislative history, or administrative and judicial interpretations of the relief provision.

Petitioner perforce concedes that nothing in the language of Section 241(f) indicates that the phrase "otherwise admissible" requires only that the alien should have met the qualitative requirements for entry. Rather, she points to the use of the same phrase in Section 211, 8 U. S.C. § 1181, and argues that we are concerned with a "term of art" referable only to qualitative standards of admissibility and not documentary or quota requirements. As applied to Section 211, which details the visa, passport and other documentary requirements for immigrants as well as applicable quota and nonquota rules, this distinction undoubtedly is sound. Indeed, the Government concedes that the first four subdivisions of Section 211(a) pertain to documentary requirements and that the context requires defining "otherwise admissible" in subdivision (5) as pertaining to quantitative admissibility. This does not mean, however, that the phrase "otherwise admissible" must of necessity be similarly construed when it arises in a wholly different context in the immigration law, designed to cover different problems. Thus, the same phrase in Section 241(f) encompasses all grounds of inadmissibility other than fraud, including quantitative standards. Any other interpretation is likely to invite frustration and wholesale evasion of the quota system which has been repeatedly endorsed by Congress since its adoption as a fundamental part of our immigration laws in 1921. If "otherwise admissible" is limited to prevent invocation of the relief provision only by the insane, prostitutes,

Communist Party members, and other qualitatively proscribed persons, the door will be opened for individuals from countries with low but oversubscribed quotas easily to circumvent and thwart this country's immigration policy. Moreover, if Congress intended to excuse not only fraud but compliance with the quota regime, it could have done so with clarity, as in the War Brides Act, 59 Stat. 659 (1945), 8 U.S.C. (1946 ed.) § 232, where the intention to remove documentary requirements was explicitly expressed in a statute which, like Section 241(f), included an "if otherwise admissible" proviso.

The legislative history, although certainly not determinative, lends support to the Government's interpretation of "otherwise admissible" in Section 241(f). Thus, in opening debate on Section 7 of the 1957 Act, the predecessor of Section 241(f), Senator Eastland assured his colleagues that "the bill does not modify the national origins quota provisions." 103 Cong.Rec. 15487 (Aug. 21, 1957). Similar statements were made in the lower chamber by Congressmen Celler and Chelf. 103 Cong.Rec. 16300, 16305–06 (Aug. 28, 1957). Moreover, when Section 7 of the 1957 Act was carried forward into the present Section 241(f), in Section 16 of the Act of September 26, 1961, 75 Stat. 655, Congress significantly abandoned a limited exception to the documentary provisions for certain displaced persons and refugees. This deletion of the special benefit provision—originally inserted to protect those aliens who misrepresented their nationality or place of birth because they feared repatriation to Communist-dominated countries (but not those who engaged in misrepresentation to evade the quota restrictions), House Rep. No. 1086, 87th Cong., 1st Sess., p. 37 (1961) U.S.Code Congressional & Administrative News, p. 2950— indicates that all aliens who now seek to invoke the fraud-excusing provisions of Section 241(f) must surmount quantitative as well as qualitative hurdles.

It is also significant that little more than a year after the enactment of Sec-

tion 241(f)'s predecessor, the Board of Immigration Appeals, in Matter of D'O——, 8 I. & N. Dec. 215 (1958), interpreted "otherwise admissible" as conditioned upon compliance with the quota requirements. That case involved an Italian citizen who fraudulently obtained a nonquota immigrant visa as a native of Argentina, a nonquota country. 8 U.S.C. § 1101(a) (27) (C). The Board, noting that nothing in the 1957 Act indicated a legislative intention to eliminate the careful protection built into the immigration laws regarding the quota system, held that the relief provision excusing fraud was inapplicable because the alien was not otherwise admissible under the Italian quota. This limited administrative view of the scope of the ameliorative provision was not questioned when Congress reenacted the section in 1961 (with the further minor limitation noted above), and, indeed, the new version was said to codify existing law. House Rep. No. 1086, 87th Cong., 1st Sess., p. 37 (1961).[4]

■ Finally, the Government's interpretation of "otherwise admissible" to include quantitative as well as qualitative requirements does not deprive Section 241(f) of all practical value, as the petitioner would have us believe. She contends that the section would help no one if it did not also waive some underlying ground of inadmissibility because where there is a material fraud or misrepresentation, there is generally an underlying ground for inadmissibility. But the weakness in this argument is the necessary qualifying word "generally"; the interpretation we endorse permits relief where the alien is excludable for fraud but not for the underlying offense.

Thus, in Matter of Mazar, 10 I. & N. Dec. —— (1962), Section 241(f) served to suspend the deportation of an alien excludable for willfully concealing his Communist Party membership but not otherwise inadmissible because that membership was involuntary under Section 212(a) (28) (I). Similarly, relief would be available to an alien who concealed a past conviction for a crime not involving moral turpitude, for such a conviction would not make the alien qualitatively inadmissible.

■ We therefore agree with the Board of Immigration Appeals that Mrs. Scott was not "otherwise admissible at the time of entry," within the meaning of Section 241(f), because the British subquota for Jamaica was oversubscribed when she obtained her visa and when she entered this country.

Dismissed.

J. JOSEPH SMITH, Circuit Judge (dissenting):

I dissent. While I agree that the purported marriage was invalid for immigration purposes, I think that we should give 241(f) an interpretation in keeping with its humanitarian purpose of ameliorating the harshness of the deportation statutes as applied to the families of citizens. Interpreting "otherwise admissible" as referring to qualitative tests rather than quota numbers would properly carry out the purpose of the Act in cases such as this, and there is no solid evidence that the Congress intended so narrow an application as that adopted, in effect carving out an exception to the relief where the fraud involved non-quota status.

4. Concededly, most judicial decisions interpreting relief measures similar to Section 241(f) involve situations where the alien was otherwise inadmissible for qualitative reasons. See, e. g., Langhammer v. Hamilton, 295 F.2d 642 (1 Cir. 1961) (membership in foreign communist party); Bonham v. Bouiss, 161 F.2d 678 (9 Cir. 1947) (racial exclusion and immorality). The Government, however, responding to petitioner's inability to find

any judicial decision where the term "otherwise admissible" or any comparable phrase was held to relate to quantitative or documentary standards of admissibility, referred us to Bufalino v. Holland, 277 F.2d 270 (3 Cir.), cert. denied, 364 U.S. 863, 81 S.Ct. 103, 5 L.Ed.2d 85 (1960), a case in which, it is now conceded, relief was denied under Section 241(f)'s predecessor because the alien lacked proper documentation.