IMMIGRATION AND NATURALIZATION
SERVICE *v.* ERRICO.

No. 54. Argued October 20, 1966.—Decided December 12, 1966.*

*Solicitor General Marshall* argued the cause for petitioner in No. 54 and for respondent in No. 91. With him on the briefs were *Assistant Attorney General Vinson, Louis F. Claiborne, L. Paul Winings* and *Charles Gordon.*

*Frank Ierulli* argued the cause for respondent in No. 54. With him on the brief was *Edwin J. Peterson.*

*Julius C. Biervliet* argued the cause for petitioner in No. 91. With him on the brief was *Edward Q. Carr, Jr.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

We granted certiorari in these cases to resolve a conflict between the Second and Ninth Circuits on their interpretations of § 241 (f) of the Immigration and

*Together with No. 91, *Scott, aka Plummer* v. *Immigration and Naturalization Service,* on certiorari to the United States Court of Appeals for the Second Circuit.

Nationality Act.[1]   The issue is identical in both cases and, therefore, lends itself to a single opinion.

Section 241 (f) reads as follows:

> "The provisions of this section relating to the deportation of aliens within the United States on the ground that they were excludable at the time of entry as aliens who have sought to procure, or have procured visas or other documentation, or entry into the United States by fraud or misrepresentation shall not apply to an alien otherwise admissible at the time of entry who is the spouse, parent, or a child of a United States citizen or of an alien lawfully admitted for permanent residence."

The issue is whether the statute saves from deportation an alien who misrepresents his status for the purpose of evading quota restrictions, if he has the necessary familial relationship to a United States citizen or lawful permanent resident.

Respondent Errico in No. 54, a native of Italy, falsely represented to the immigration authorities that he was a skilled mechanic with specialized experience in repairing foreign automobiles.   On the basis of that misrepresentation he was granted first preference quota status under the statutory preference scheme then in effect, and entered the United States in 1959 with his wife.   A child was born to the couple in 1960 and acquired United States citizenship at birth.   In 1963 deportation proceedings were commenced against Errico on the ground that he was excludable at the time of entry as not "of the proper status under the quota specified in the immigrant visa." [2]

---

[1] 75 Stat. 655 (1961), 8 U. S. C. § 1251 (f).

[2] Section 211 (a)(4) of the Immigration and Nationality Act, 66 Stat. 181 (1952), later amended, 79 Stat. 917 (1965), 8 U. S. C. § 1181 (a) (1964 ed., Supp. I).   Aliens who were excludable at the time of entry under the law then existing are deportable under § 241 (a)(1), 66 Stat. 204 (1952), as amended, 8 U. S. C. § 1251 (a)(1).

Throughout the proceedings Errico insisted that he was saved from deportation by § 241 (f). The special inquiry officer of the Immigration and Naturalization Service ruled that relief under § 241 (f) was not available because Errico had not complied with quota requirements and, hence, was not "otherwise admissible at the time of entry." The Board of Immigration Appeals affirmed the deportation order but the Court of Appeals for the Ninth Circuit reversed, holding that the construction of the statute adopted by the Board would strip it of practically all meaning, since a material misrepresentation would presumably be given to conceal some factor that would bear on admissibility. 349 F. 2d 541. We granted certiorari. 383 U. S. 941.

Petitioner Scott in No. 91, a native of Jamaica, contracted a marriage with a United States citizen by proxy solely for the purpose of obtaining nonquota status for entry into the country. She has never lived with her husband and never intended to do so. After entering the United States in 1958, she gave birth to an illegitimate child, who became an American citizen at birth. When the fraud was discovered, deportation proceedings were begun, and a special inquiry officer of the Immigration and Naturalization Service found her deportable on the ground that she was not a nonquota immigrant as specified in her visa.[3] The Board of Immigration Appeals affirmed, and the Court of Appeals for the Second Circuit affirmed the Board. 350 F. 2d 279. The court agreed with the Board of Immigration Appeals that a sham marriage contracted solely to circumvent the immigration laws would not confer nonquota status on an alien as the spouse of an American citizen. It also affirmed the ruling that Mrs. Scott was not entitled to relief under § 241 (f) because she was not otherwise admissible

---

[3] Section 211 (a) (3), 66 Stat. 181 (1952), later amended, 79 Stat. 917 (1965), 8 U. S. C. § 1181 (a) (1964 ed., Supp. I).

at the time of entry, since her country's quota was over-subscribed. We granted certiorari. 383 U. S. 941.

At the outset it should be noted that even the Government agrees that § 241 (f) cannot be applied with strict literalness. Literally, § 241 (f) applies only when the alien is charged with entering in violation of § 212 (a)(19) of the statute, which excludes from entry "[a]ny alien who . . . has procured a visa or other documentation . . . by fraud, or by willfully misrepresenting a material fact." [4] Under this interpretation, an alien who entered by fraud could be deported for having entered with a defective visa or for other documentary irregularities even if he would have been admissible if he had not committed the fraud. The Government concedes that such an interpretation would be inconsistent with the manifest purpose of the section, and the administrative authorities have consistently held that § 241 (f) waives any deportation charge that results directly from the misrepresentation regardless of the section of the statute under which the charge was brought, provided that the alien was "otherwise admissible at the time of entry." [5] The Government's argument in both cases is that to be otherwise admissible at the time of entry the alien must show that he would have been admitted even if he had not lied, and that the aliens in these cases would not have been admitted because of the quota restrictions. It is the argument of the aliens that our adoption of the government thesis would negate the intention of Congress to apply fair humanitarian standards in granting relief from the consequences of their fraud to aliens who are close relatives of United States citizens, and that the statute would have practically no effect if construed as the Government argues, since it

---

[4] 66 Stat. 183 (1952), as amended, 8 U. S. C. § 1182 (a)(19).

[5] See *Matter of S—*, 7 I. & N. Dec. 715 (1958); *Matter of Y—*, 8 I. & N. Dec. 143 (1959).

requires a considerable stretch of the imagination to conceive of an alien making a material misrepresentation that did not conceal some factor that would make him inadmissible.

The sharp divergence of opinion among the circuit judges in these cases indicates that the meaning of the words "otherwise admissible" is not obvious. An interpretation of these words requires close attention to the language of § 241 (f), to the language of its predecessor, § 7 of the 1957 Act,[6] and to the legislative history of these provisions.

The legislative history begins with the enactment of the Displaced Persons Act of 1948, 62 Stat. 1009. This Act provided for the admission to the United States of thousands of war refugees, many from countries that had fallen behind the Iron Curtain. Some of these refugees misrepresented their nationality or homeland while in Europe to avoid being repatriated to a Communist country. In so doing, however, they fell afoul of § 10 of the Act, which provided that persons making willful misrepresentations for the purpose of gaining admission "shall thereafter not be admissible into the United States." The plight of these refugees, who were excluded from the United States for misrepresentations that were generally felt to be justifiable, inspired recurring proposals for statutory reform. When the Act was revised and codified in 1952, the House Committee recommended adding a provision to save such refugees from deportation when they had misrepresented their nationality or homeland only to avoid repatriation and persecution.[7] The Conference Committee deleted the provision, but announced its sympathy with the refugees in the following terms:

"It is also the opinion of the conferees that the sections of the bill which provide for the exclusion

---

[6] Pub. L. 85–316, 71 Stat. 639 (1957).

[7] See H. R. Rep. No. 1365, 82d Cong., 2d Sess., p. 128 (1952).

of aliens who obtained travel documents by fraud or by willfully misrepresenting a material fact, should not serve to exclude or to deport certain bona fide refugees who in fear of being forcibly repatriated to their former homelands misrepresented their place of birth when applying for a visa and such misrepresentation did not have as its basis the desire to evade the quota provisions of the law or an investigation in the place of their former residence. The conferees wish to emphasize that in applying fair humanitarian standards in the administrative adjudication of such cases, every effort is to be made to prevent the evasion of law by fraud and to protect the interest of the United States." H. R. Rep. No. 2096, 82d Cong., 2d Sess., p. 128 (1952).

The Immigration and Naturalization Service and the Attorney General did not construe the statute as the Conference Committee had recommended, believing that the explicit statutory language did not allow for an exemption for justifiable misrepresentations. Refugees who misrepresented their place of origin were always found to have concealed a material fact, since the misrepresentation hindered an investigation of their background.[8]

The misrepresentation section was not the only provision of the 1952 legislation that was widely thought to be unnecessarily harsh and restrictive, and in 1957 Congress passed legislation alleviating in many respects the stricter provisions of the earlier legislation. The purpose of the 1957 Act is perfectly clear from its terms, as well as from the relevant House and Senate Com-

---

[8] See *Matter of B— and P—*, 2 I. & N. Dec. 638 (1947); H. R. Rep. No. 1199, 85th Cong., 1st Sess., p. 10 (1957).

220

mittee Reports.[9]   The most important provisions of the
Act provide for special nonquota status for the adopted
children or illegitimate children of immigrant parents,
and for orphans who have been or are to be adopted by
United States citizens.   Other important provisions allow
the Attorney General to waive certain grounds for ex-
clusion or deportation, including affliction with tubercu-
losis or conviction of a crime involving moral turpitude,
on behalf of aliens who are near relatives of United
States citizens or of aliens lawfully admitted for per-
manent residence.   The intent of the Act is plainly to
grant exceptions to the rigorous provisions of the 1952
Act for the purpose of keeping family units together.
Congress felt that, in many circumstances, it was more
important to unite families and preserve family ties than
it was to enforce strictly the quota limitations or even
the many restrictive sections that are designed to keep
undesirable or harmful aliens out of the country.[10]

In this context it is not surprising that Congress also
granted relief to aliens facing exclusion or deportation

---

[9] "The legislative history of the Immigration and Nationality Act
clearly indicates that the Congress intended to provide for a liberal
treatment of children and was concerned with the problem of keeping
families of United States citizens and immigrants united." H. R.
Rep. No. 1199, 85th Cong., 1st Sess., p. 7 (1957).   See also S. Rep.
No. 1057, 85th Cong., 1st Sess. (1957).

[10] It is in this context that the legislative history cited in the
dissent should be understood.   The remarks of Senator Eastland and
Congressman Celler quoted in footnote 4 of the dissent in context do
not refer to § 7 of the Act but to the provisions of the bill providing
for the adoption of alien orphans.   Furthermore, Senator Eastland
and Congressman Celler did not mean that no exceptions to the
quota requirements were intended to be created, because the basic
purpose of the bill was to relax the quota system for adopted children
and for certain other classes of aliens deemed deserving of relief.
They were reassuring their colleagues that no fundamental changes
in the quota system were contemplated.

because they had gained entry through misrepresentation. Section 7 of the 1957 Act provided that:

"The provisions of section 241 of the Immigration and Nationality Act relating to the deportation of aliens within the United States on the ground that they were excludable at the time of entry as (1) aliens who have sought to procure, or have procured visas or other documentation, or entry into the United States by fraud or misrepresentation, or (2) aliens who were not of the nationality specified in their visas, shall not apply to an alien otherwise admissible at the time of entry who (A) is the spouse, parent, or a child of a United States citizen or of an alien lawfully admitted for permanent residence; or (B) was admitted to the United States between December 22, 1945, and November 1, 1954, both dates inclusive, and misrepresented his nationality, place of birth, identity, or residence in applying for a visa: *Provided,* That such alien described in clause (B) shall establish to the satisfaction of the Attorney General that the misrepresentation was predicated upon the alien's fear of persecution because of race, religion, or political opinion if repatriated to his former home or residence, and was not committed for the purpose of evading the quota restrictions of the immigration laws or an investigation of the alien at the place of his former home, or residence, or elsewhere. After the effective date of this Act, any alien who is the spouse, parent, or child of a United States citizen or of an alien lawfully admitted for permanent residence and who is excludable because (1) he seeks, has sought to procure, or has procured, a visa or other documentation, or entry into the United States, by fraud or misrepresentation, or (2) he admits the commission of

perjury in connection therewith, shall hereafter be granted a visa and admitted to the United States for permanent residence, if otherwise admissible, if the Attorney General in his discretion has consented to the alien's applying or reapplying for a visa and for admission to the United States."

This section waived deportation under certain circumstances for two classes of aliens who had entered by fraud or misrepresentation. First, an alien who was "the spouse, parent, or a child of a United States citizen . . ." was saved from deportation for his fraud if he was "otherwise admissible at the time of entry." Second, an alien who entered during the postwar period and misrepresented his nationality, place of birth, identity, or residence was saved from deportation if he was "otherwise admissible at the time of entry" *and* if he could

"establish to the satisfaction of the Attorney General that the misrepresentation was predicated upon the alien's fear of persecution because of race, religion, or political opinion if repatriated to his former home or residence, and was not committed for the purpose of evading the quota restrictions of the immigration laws or an investigation of the alien at the place of his former home, or residence, or elsewhere."

This language would be meaningless if an alien who committed fraud for the purpose of evading quota restrictions would be deportable as not "otherwise admissible at the time of entry." Congress must have felt that aliens who evaded quota restrictions by fraud would be "otherwise admissible at the time of entry" or it would not have found it necessary to provide further that, in the case of an alien *not* possessing a close familial relationship to a United States citizen or lawful per-

manent resident, the fraud must not be for the purpose of evading quota restrictions.

This conclusion is reinforced by the fact that Congress further specified that the aliens who were not close relatives of United States citizens must establish that their fraud was not committed for the purpose of evading an investigation. Fraud for the purpose of evading an investigation, if forgiven by the statute, would clearly leave the alien "otherwise admissible" if there were no other disqualifying factor. Elementary principles of statutory construction lead to the conclusion that Congress meant to specify two specific types of fraud that would leave an alien "otherwise admissible" but that would nonetheless bar relief to those aliens who could not claim close relationship with a United States citizen or alien lawfully admitted for permanent residence.

The present § 241 (f) is essentially a re-enactment of § 7 of the 1957 Act. The legislative history leaves no doubt that no substantive change in the section was intended.[11] The provision dealing with aliens who had entered the United States between 1945 and 1954, and had misrepresented their nationality for fear of persecution or repatriation, was omitted because it had accomplished its purpose; the rest of the section was retained intact.[12] It could hardly be argued that Congress intended to change the construction of the statute by this codification.

The intent of § 7 of the 1957 Act not to require that aliens who are close relatives of United States citizens have complied with quota restrictions to escape deportation for their fraud is clear from its language, and there is nothing in the legislative history to suggest that Congress had in mind a contrary result. The only specific

---

[11] H. R. Rep. No. 1086, 87th Cong., 1st Sess., p. 37 (1961). See also 107 Cong. Rec. 19653–19654 (1961) (remarks of Senator Eastland).

[12] H. R. Rep. No. 1086, 87th Cong., 1st Sess., p. 37 (1961).

reference to the part of § 7 that deals with close relatives of United States citizens or residents is in the House Committee Report, and it says only that most of the persons eligible for relief would be

"Mexican nationals, who, during the time when border-control operations suffered from regrettable laxity, were able to enter the United States, establish a family in this country, and were subsequently found to reside in the United States illegally." H. R. Rep. No. 1199, 85th Cong., 1st Sess., p. 11.

Without doubt most of the aliens who had obtained entry into the United States by illegal means were Mexicans, because it has always been far easier to avoid border restrictions when entering from Mexico than when entering from countries that do not have a common land border with the United States. There is nothing in the Committee Report to indicate that relief under the section was intended to be restricted to Mexicans, however. Neither does it follow that, because Mexicans are not subject to quota restrictions, therefore nationals of countries that do have a quota must be within the quota to obtain relief.

The construction of the statute that we adopt in these cases is further reinforced when the section is regarded in the context of the 1957 Act. The fundamental purpose of this legislation was to unite families. Refugees from Communist lands were also benefited, but the Act principally granted relief to persons who would be temporarily or permanently separated from their nearest relatives if the strict requirements of the Immigration and Nationality Act, including the national quotas, were not relaxed for them. It was wholly consistent with this purpose for Congress to provide that immigrants who gained admission by misrepresentation, perhaps many years ago, should not be deported because their countries' quotas were oversubscribed when they entered if the

effect of deportation would be to separate families composed in part of American citizens or lawful permanent residents.

Even if there were some doubt as to the correct construction of the statute, the doubt should be resolved in favor of the alien. As this Court has held, even where a punitive section is being construed:

> "We resolve the doubts in favor of that construction because deportation is a drastic measure and at times the equivalent of banishment or exile, *Delgadillo* v. *Carmichael*, 332 U. S. 388. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty. To construe this statutory provision less generously to the alien might find support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used." *Fong Haw Tan* v. *Phelan*, 333 U. S. 6, 10.

See also *Barber* v. *Gonzales*, 347 U. S. 637, 642–643. The 1957 Act was not a punitive statute, and § 7 of that Act, now codified as § 241 (f), in particular was designed to accomplish a humanitarian result. We conclude that to give meaning to the statute in the light of its humanitarian purpose of preventing the breaking up of families composed in part at least of American citizens, the conflict between the circuits must be resolved in favor of the aliens, and that the *Errico* decision must be affirmed and the *Scott* decision reversed.

*It is so ordered.*

MR. JUSTICE STEWART, with whom MR. JUSTICE HARLAN and MR. JUSTICE WHITE join, dissenting.

The facts in one of these cases (No. 91) vividly illustrate the effect of the Court's interpretation of § 241 (f)

of the Immigration and Nationality Act. The petitioner, a resident of Jamaica, paid for a sham marriage with an American citizen. A ceremony was held, but the petitioner and her "husband" parted immediately and have not seen each other since. However, the pretended marriage served its purpose; the petitioner was admitted into this country as a nonquota immigrant upon her false representation that she was the wife of a United States citizen. After this fraudulent entry she managed to become the actual parent of a United States citizen by conceiving and bearing an illegitimate child here.

The Court holds that this unsavory series of events gives the petitioner an unqualified right under § 241 (f) to remain in this country ahead of all the honest people waiting in Jamaica and elsewhere to gain lawful entry.[1] I can find no support in the statute for such an odd and inequitable result.

Section 241 (f) provides as follows:

> "The provisions of this section relating to the deportation of aliens within the United States on the ground that they were excludable at the time of entry as aliens who have sought to procure, or have procured visas or other documentation, or entry into the United States by fraud or misrepresentation shall not apply to an alien otherwise admissible at the time of entry who is the spouse, parent, or a child of a United States citizen or of an alien lawfully admitted for permanent residence."

It seems clear to me, for two separate and independently sufficient reasons, that this statute does not operate to bar the deportation of the aliens in the cases now

---

[1] When "Mrs. Scott" made her fraudulent entry in 1958, Jamaica had an annual quota of 100 immigrants and a waiting list of 21,759 hopeful applicants. The corresponding figures for Italy in 1959, the year of Mr. Errico's entry, were 5,666 and 162,612.

before us. In the first place, § 241 (f) has application only to the deportation provisions which are based upon fraudulent entry, and the aliens in these two cases were not ordered to be deported under those provisions. Secondly, even if it were generally applicable, § 241 (f) does not cover the aliens involved in these two cases, because neither of them was "otherwise admissible" at the time of entry.

### I.

Section 241 (f) by its terms neutralizes only those "provisions . . . relating to the deportation of aliens within the United States on the ground that they . . . sought to procure . . . entry into the United States by fraud or misrepresentation . . . ." Although the aliens in these two cases could have been deported under those "provisions," the deportation proceedings in both cases were in fact brought on grounds unrelated to their procurement of fraudulent visas. Both aliens were ordered to be deported, not because of their fraud, but because they were not properly within their countries' quotas.

The plain terms of § 241 (f), therefore, do not even potentially apply to these aliens.[2] To hold that § 241 (f) is relevant to these cases is tantamount to holding that

---

[2] The Court states that the Government "concedes" and that "administrative authorities have consistently held that § 241 (f) waives any deportation charge that results directly from the misrepresentation." *Ante*, at 217. But this concession and administrative practice fall far short of covering these cases. For here the grounds for deportation did not "[result]" directly from the misrepresentation." They antedated and were the reason for the misrepresentation. The "administrative authorities" cited by the Court turned upon this distinction. In *Matter of Y—*, 8 I. & N. Dec. 143 (1959), for example, the Board of Immigration Appeals broadened § 241 (f) enough to cover fraud-related administrative procedural defects in the alien's entry. It is this construction of § 241 (f) which the Government concedes, not the Court's construction which broadens the statute to excuse all disqualifications for entry.

228

it is applicable to bar deportation based on any ground at all so long as the alien lied about that ground at the time of his unlawful entry.[3]  I think nothing could be further from the statutory language or the congressional purpose.

## II.

But even if § 241 (f) were generally applicable, these aliens could not claim its benefits because they were not within their respective national immigration quotas and therefore were not "otherwise admissible" at the time they entered the United States.  That is the clear import of the statutory qualification, if its words are to be taken at their face value.  That, too, has been the uniform and consistent administrative construction of the statute. See *Matter of D'O—*, 8 I. & N. Dec. 215 (1958); *Matter of Slade,* 10 I. & N. Dec. 128 (1962).

To except quota requirements of admissibility from the statutory qualification of "otherwise admissible" would undercut the elaborate quota system which was for years at the heart of the immigration laws.  Yet the legislative history of the predecessor of § 241 (f), § 7 of the 1957 Act, makes clear that the limited relief given by the statute was to have no effect at all on the quota system.[4]

---

[3] Thus, a Communist who had lied to the immigration authorities about his party membership at the time of entry could invoke § 241 (f) and remain in this country, while one who had told the truth, but was admitted by virtue of an administrative error, could be deported.  See § 212 (a)(28), Immigration and Nationality Act.

[4] Senator Eastland, Chairman of the Committee which sponsored the 1957 amendments to the Immigration Act, stated, "the bill does not modify the national origins quota provisions."  103 Cong. Rec. 15487 (Aug. 21, 1957). See also 103 Cong. Rec. 16300 (Aug. 28, 1957) (remarks of Congressman Celler), "[The bill] makes no changes—no changes whatsoever, in the controversial issue of the national origins quota system."

Pub. L. 89–236, 79 Stat. 911, made substantial changes in the quota system.  But that statute, passed in 1965, hardly indicates a

Moreover, the consistent use of the same qualifying phrase, "otherwise admissible" in other sections of the Immigration and Nationality Act makes clear that, as a term of art, it includes quota admissibility. The term typically follows a definition of grounds for admissibility or for exceptions to deportation, to insure that all the other relevant requirements of the Act are imposed upon the alien.[5]

Thus the plain meaning of the "otherwise admissible" qualification, as well as legislative policy and legislative history, all indicate that the term serves the same basic function in § 241 (f) as in other sections of the Act. Fraud is removed as a ground for deportation of those with the requisite family ties, and "otherwise admissible" insures the integrity of the remainder of the statutory scheme.[6]

---

congressional intent in 1957 or in 1961 (when the present statute was revised) to abandon quota requirements.

[5] See, e. g., §§ 211 (a) and (b); The War Brides Act, 59 Stat. 659.

[6] Under § 7 of the 1957 Act certain aliens had to establish both that they were "otherwise admissible" and that they had not lied to evade quota restrictions. The Court reasons from this that quota restrictions are not embodied in the "otherwise admissible" qualification. But this reasoning is inconsistent with the Court's conclusion concerning the general applicability of § 241 (f), discussed in Part I of this dissent.

Section 7 of the earlier Act provided as follows:

"The provisions of section 241 of the Immigration and Nationality Act relating to the deportation of aliens within the United States on the ground that they were excludable at the time of entry as (1) aliens who have sought to procure, or have procured visas or other documentation, or entry into the United States by fraud or misrepresentation, or (2) aliens who were not of the nationality specified in their visas, shall not apply to an alien otherwise admissible at the time of entry who . . . ." (Emphasis supplied.)

If the present meaning of "otherwise admissible" is to be determined by the 1957 Act, so then must other parts of the statute be similarly determined. Section 241 (f) begins with words almost identical

230

The Court justifies its disregard of the plain meaning and consistent administrative construction of § 241 (f) by resort to the spirit of humanitarianism which is said to have moved Congress to enact the statute. No doubt Congress in 1957 was concerned with giving relief to some aliens who had entered this country by illegal means and established families here. But the people who were to benefit from this genuine human concern were those from countries like Mexico, which had no quota restrictions, and those who had misrepresented their national origins in order to avoid repatriation to Iron Curtain countries. There is nothing to indicate that Congress enacted this legislation to allow wholesale evasion of the Immigration and Nationality Act or as a general reward for fraud.

I respectfully dissent.

---

to those quoted above. But the second ground of applicability—to "aliens who were not of the nationality specified in their visas"—is omitted. Thus, lies about nationality were not forgiven by the first part of the 1957 Act and are not, by the Court's reasoning, excused by § 241 (f), the successor statute. And since there is nothing to distinguish lies about nationality that avoid quota restrictions from other lies with the same effect, the reasoning that leads to the Court's conclusion that the aliens were "otherwise admissible" leads also to the conclusion that § 241 (f) is not applicable at all in these cases.