In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3912

RAMON HUMBERTO MARIN-GARCIA,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A097-448-489

ARGUED MAY 12, 2011—DECIDED JULY 22, 2011

Before BAUER, FLAUM, and EVANS, *Circuit Judges.*

FLAUM, *Circuit Judge.* Ramon Humberto Marin-Garcia seeks to prevent the government from removing him from the country. He argues chiefly that doing so would violate the constitutional rights of his three daughters, natural-born United States citizens who will travel to Mexico with him if we deny his petition for review. Although we agree that he has standing to make

the argument, we reject it on the merits. His secondary arguments fare no better. Accordingly, we deny his petition for review.

## I. Background

Marin-Garcia is a Mexican citizen. In June 1991, he entered the United States "without inspection." *See* 8 U.S.C. § 1225(a)(3). Because he was not properly admitted into the United States, he was eligible for removal. *See* 8 U.S.C. §§ 1182(a)(6)(A)(i), 1227(a)(1). In 2003, the Department of Homeland Security initiated removal proceedings. During the 12 years between his arrival and the start of removal proceedings, Marin-Garcia got married and took the helm of a small family. Although his wife also lacks legal status, he pays taxes and has a home in Beloit, Wisconsin. Each of his three daughters was born in this country. Therefore, they are citizens of the United States. U.S. CONST. amend. XIV, § 1, cl. 1; 8 U.S.C. § 1401.

In the proceedings against him, Marin-Garcia did not contest his removability. Rather, he sought cancellation of removal under 8 U.S.C. § 1229b(b). The provision puts discretion in the hands of the Attorney General to cancel the removal of an alien if four criteria are satisfied: (1) he has been in the United States for 10 continuous years immediately preceding the application for cancellation; (2) he has been a person of good moral character during that period; (3) he has not been convicted of certain statutorily specified offenses; and (4) he "establishes that removal would result in exceptional and

extremely unusual hardship to [his] spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8 U.S.C. § 1229b(b)(1)(A)-(D). By the statute's terms, all four criteria must be satisfied, and we generally lack jurisdiction to question the Attorney General's decision not to exercise his discretion. *See* 8 U.S.C. § 1252(a)(2)(B)(i); 8 U.S.C. § 1252(a)(2)(D).

In evaluating the four cancellation criteria, the key issue for the immigration judge (and stumbling block for Marin-Garcia) related to the fourth requirement of § 1229b(b)—whether removal would result in "exceptional and extremely unusual hardship" to Marin-Garcia's citizen-children. His daughters are natural-born United States citizens, between 10 to 15 years of age (at the time of the removal proceedings). One is asthmatic, and her condition could be exacerbated by the dusty roads in the area of Mexico to which Marin-Garcia would return. The other two daughters have had medical conditions that appear less-obviously severe. All of the girls would be without health insurance in Mexico. The daughters also would face educational challenges. There is some indication that none reads or writes in Spanish, although the immigration judge stated that the "children undoubtedly . . . speak Spanish in order to speak to their parents." After considering the evidence, the immigration judge reasoned that the challenges faced by Marin-Garcia's family were not sufficiently serious to qualify as exceptional and extremely unusual. Therefore, the judge concluded that Marin-Garcia was ineligible for cancellation of removal under § 1229b(b). The Board

of Immigration Appeals agreed with the immigration judge's reasoning and dismissed the appeal that followed.

Marin-Garcia has now filed a petition for review with us, contending chiefly that removing him from the United States would violate the United States Constitution. Specifically, Marin-Garcia argues that the Board's framework for evaluating cancellation requests, beginning with a decision called *Matter of Monreal*, 23 I. & N. Dec. 56 (BIA 2001), violates the equal protection rights of his daughters. His principal argument is that the Board's application of Section 1229b(b)(1)(D)—exceptional and extremely unusual hardship—is unconstitutional because the Board's framework compares the hardship of citizen-children to the hardship of aliens in general, rather than comparing the hardship of citizen-children to "the citizen children population at large." Petitioner's Brief at 8. Meanwhile, the government argues that a prudential limitation on the exercise of federal jurisdiction prevents us from entertaining his arguments. The government maintains that Marin-Garcia does not have standing to advance arguments based on the interests of his daughters.

## II. Discussion

Although we generally lack jurisdiction to review the Attorney General's discretionary decision under the Immigration and Nationality Act not to cancel Marin-Garcia's removal, we retain jurisdiction over constitutional claims and matters of law. 8 U.S.C. § 1252(a)(2)(D); *Frederick v. Holder*, No. 09-2607, 2011 WL 1642811, at *4

(7th Cir. May 3, 2011). Typically our review of such matters is de novo, *see Barradas v. Holder*, 582 F.3d 754, 765 (7th Cir. 2009), but in this case we view Marin-Garcia's argument for the first time; below, the Board concluded that it was not empowered to entertain the constitutional challenges that Marin-Garcia raises. We conclude as follows: Marin-Garcia has third-party standing to make the arguments he advances on behalf of his daughters. He cannot succeed on the merits, however. Among other problems, his chief constitutional argument is based on an erroneous reading of the Board's decision in *Matter of Monreal*, a case which sets out the agency's framework for determining whether removing an alien would cause citizen-relatives to suffer an "exceptional and extremely unusual hardship" within the meaning of 8 U.S.C. § 1229b(b)(1)(D).

## A. Third-Party Standing

Before we address the merits, a discussion of Marin-Garcia's standing is in order. His chief argument centers primarily on the rights of his daughters. Generally, however, Person *A* is not entitled to advance the legal interests of Person *B* in federal court. That is, even though a person may suffer an injury that satisfies the constitutional case or controversy requirement of Article III, Section 2 of the United States Constitution, *Singleton v. Wulff*, 428 U.S. 106, 112-13 (1976), he generally may not redress his injury by reference to someone else's rights, *Barrows v. Jackson*, 346 U.S. 249, 255 (1953). *See also U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720 (1990)

(observing that "[t]his is generally so even when the very same allegedly illegal act that affects the litigant also affects a third party"). The presumption against third-party standing is a "prudential limitation on the exercise of federal jurisdiction." *Miller v. Albright*, 523 U.S. 420, 445 (1998) (O'Connor, J., concurring). It is a pre-jurisdictional, threshold question for federal courts, *see Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005), which "recognizes that claims are best prosecuted by those who actually have been injured, rather than by someone in their stead," *Massey v. Wheeler*, 221 F.3d 1030, 1035 (7th Cir. 2000).

Despite the general impediment to advancing someone else's interests, the Supreme Court has held that a person may litigate another's rights in his own cause so long as three criteria are satisfied: (1) the litigant must have suffered an injury in fact; (2) the litigant must have a close relation to the third party; and (3) there must exist some hindrance to the third party's ability to protect his or her own interest. *Powers v. Ohio*, 499 U.S. 400, 410-11, 415 (1991) (holding that a criminal defendant had standing to raise the equal protection rights of a would-be juror excluded from service by the prosecution).

All three criteria have been satisfied in this case. Marin-Garcia has suffered a concrete injury in the form of his removal order and impending removal from the United States. He is by definition closely related to his daughters. As to the third requirement, his daughters are minor children and therefore are "hindered" from bringing suit themselves. *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 841 n.44 (1977). Moreover,

Marin-Garcia is in the best position to litigate the case, because he is the only party to the immigration proceeding, even though his daughters' rights may be affected. The First Circuit, on similar facts with similar arguments, has reached the same conclusion. *Payne-Barahona v. Gonzales*, 474 F.3d 1, 2 (1st Cir. 2007) (reasoning that "the requirements in *Powers* . . . appear easily met in this instance").

The government's argument to the contrary misunderstands the third-party-standing inquiry. The government maintains that Marin-Garcia lacks third-party standing because his daughters do not have meritorious claims. The doctrine of third-party standing is an antecedent question that we answer in order to tell us if we may reach the merits. Having answered in the affirmative, we proceed.

## B. Merits

The merits are where Marin-Garcia's petition founders. As we noted above, federal appeals courts ordinarily lack jurisdiction to review the Attorney General's discretionary decisions regarding cancellation of removal under 8 U.S.C. § 1229b(b). The general bar appears in 8 U.S.C. § 1252(a)(2)(B)(i), which provides that "no court shall have jurisdiction to review . . . any judgment regarding the granting of relief under section . . . 1229b . . . of this title. . . ." Under Section 1252(a)(2)(D), however, we retain jurisdiction to review constitutional matters and questions of law.

Marin-Garcia's chief argument is a constitutional one. This is the distillation of his at-times-difficult-to-follow argument: *the Board of Immigration Appeals, in evaluating the hardship that removing illegal aliens inflicts on citizen-relative family members, compares the hardship inflicted on citizen-relatives to the hardship inflicted on other aliens. The proper comparison group is other citizen-relatives of United States citizens (who, of course, do not face removal). Therefore, the Board's framework violates the equal protection component of the Fifth Amendment's due process clause.*[1] We indicated our skepticism about a nearly identical argument, though we did not take it up, in *Leyva v. Ashcroft*, 380 F.3d 303, 305 (7th Cir. 2004). In *Leyva*, we did not address the argument head-on because at the time there was a more stringent jurisdictional bar than exists today.

In giving additional attention to the matter now, we observe that the first half of Marin-Garcia's argument never gains traction. He derives the Board's allegedly unconstitutional framework for evaluating exceptional and extremely unusual hardship from the latter's decision in *Matter of Monreal*, 23 I. & N. Dec. 56 (BIA 2001), and contends that the Board's decision compares the hardship of citizen-relatives to the hardship of aliens. Although it is not precisely clear what he means by

---

[1] Throughout his brief, Marin-Garcia invokes to Fourteenth Amendment, which by its terms applies to the states. The Fifth Amendment provides the proper textual home for the arguments that he makes. *See San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 542 & n.21 (1987).

that statement, he does not seem to take issue with the fact that Section 1229b(b)(1)(D) takes into consideration the hardship that an alien's removal may impose on a lawful permanent resident. *Cf. Toll v. Moreno*, 458 U.S. 1, 43-44 (1982) (indicating that states generally possess few legitimate reasons to distinguish between citizens and lawfully resident aliens). Homing in on the argument further is not necessary, however, because Marin-Garcia's offers an insupportable reading of *Monreal*. In that decision, the Board comprehensively explored the meaning and implications of Congress's requirement that only "exceptional and extremely unusual hardship" to close relatives can trigger the Attorney General's discretion to cancel an alien's removal. The decision traced the history of the statutory language and thoughtfully analyzed Congress's non-self-defining language in 8 U.S.C. § 1229b(b)(1)(D).

At no point in the decision did *Monreal* suggest that the hardship of citizen-relatives of aliens must or could be compared to the hardship endured by aliens themselves. *See Monreal*, 23 I. & N. Dec. at 63 (stating that hardship to "the applicant for relief . . . cannot be considered under the cancellation statute, where *only* hardship to qualifying relatives . . . may be considered"). Nor does the decision make distinctions on the basis of race, as Marin-Garcia intimates. Rather, just like the statutory language that Congress enacted, *Monreal* teaches that to trigger the Attorney General's discretion under Section 1229b(b)(1)(D) the hardship to citizen-relatives must be greater than the typical hardship endured by close family members when an alien is removed. *Id.* at 63-64

(providing a general summary of factors that immigration judges should consider). The language of the statute and the discussion in *Monreal* is straightforward—as is the discussion in the subsequent cases applying *Monreal*. *See Matter of Recinas*, 23 I. & N. Dec. 467, 468-69 (BIA 2002); *Matter of Andaloza*, 23 I. & N. Dec. 319, 321 (BIA 2002). Simply put, the premise of Marin-Garcia's argument—that some constitutional ill flows from the Board's practice of comparing citizen-relatives to aliens—is incorrect. The collapse of the argument's premise takes the conclusion with it.

The other half of Marin-Garcia's principal argument is that the equal protection component of the due process clause, *see Bolling v. Sharpe*, 347 U.S. 497, 498-99 (1954), is violated because Section 1229b(b)(1)(D) as applied by the Board does not compare citizen-relatives of aliens to citizen-relatives of U.S. citizens. In Marin-Garcia's estimation, "[t]he acceptable measurement standard when analyzing exceptional and extremely unusual hardship to United States citizen children ought to be how . . . any of the approximately 74,718,000, under 18 year old United States citizens . . . [would] suffer if forced to abandon the United States . . . ." Petitioner's Brief at 24. That entirely hypothecated inquiry[2] would appear to hurt Marin-Garcia's chances. Although Marin-Garcia

---

[2] "The exclusion of aliens and the reservation of the power to deport have no permissible counterpart in the Federal Government's power to regulate the conduct of its own citizenry." *Mathews v. Diaz*, 426 U.S. 76, 80 (1976) (footnotes omitted).

does not set out to explain how his proposed standard might play out, it would seem that the shorter the time period that a family has remained in the United States, the stronger the cultural, familial, and economic ties to the country from which the family emigrated. Thus, the standard he proposes would make it less likely that (more recently arrived) aliens could establish their eligibility for cancellation of removal under Section 1229b(b). We need not remand an immigration case where doing so would prove futile. *See Shou Wei Jin v. Holder*, 572 F.3d 392, 396 (7th Cir. 2009).

Moreover, it seems that Marin-Garcia's real (if never fully articulated) contention is that due process or equal protection of the laws goes unfulfilled when the government exposes citizen-children to removal—in the non-technical sense—when their parents are forced to leave. After all, children whose parents are United States citizens will not face the specter of being taken to a land they have never known, and being effectively forced to leave the country may deprive a person of "all that makes life worth living." *See Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922). However, Congress's authority over immigration matters is expansive. *See Mathews v. Diaz*, 426 U.S. 67, 81 (1976). "Congress has . . . exceptionally broad power to determine which classes of aliens may lawfully enter the country." *Fiallo v. Bell*, 430 U.S. 787, 794 (1977). A necessary corollary of Congress's gate-keeping power is the authority to remove someone who has unlawfully entered. And although equal protection requires "that all persons similarly circumstanced shall be treated alike," *Plyler v. Doe*, 457 U.S. 202, 216 (1982)

(quotation marks omitted), the constitution "does not require things which are different in fact . . . to be treated in law as though they were the same," *id.* (quoting *Tigner v. Texas*, 310 U.S. 141, 147 (1940)).

In *Fiallo*, the Court considered a challenge brought by illegal immigrant fathers and their illegitimate citizen-children to immigration preferences contained in the Immigration and Nationality Act. Under one of the provisions at issue, for example, a mother could gain entry into the United States if her child was a citizen, skirting other immigration requirements along the way. However, the natural father of such a child, if the child was illegitimate, was not entitled to preferential treatment. *Fiallo*, 430 U.S. at 788-90. Although the Court recognized that the regime discriminated against men and would burden the interests of citizens by preventing their loved ones from entering the United States, *see id.* at 794-95 & n.6, it noted Congress's broad powers over immigration matters and ruled that it would not apply "a more exacting standard" than to ask whether Congress or the executive advanced "a facially legitimate and bona fide reason" for acting in the manner it had chosen. *See id.* at 794-95 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972)).

Marin-Garcia does not convincingly explain why a more stringent standard should apply here, and we perceive no good reason ourselves.[3] The practice of

---

[3] In *Nguyen v. I.N.S.*, 533 U.S. 53, 60-61 (2001), the Court held that a gender-based classification which related to the acquisi-

(continued...)

removing aliens with citizen-children is constitutionally sound, and we also perceive no constitutional infirmity with the statute. Section 1229b(b)(1)(D) distinguishes between aliens who have close citizen-relatives in the United States and aliens who do not. Only if an alien has close citizen-relatives may the Attorney General cancel removal. Thus, Section 1229b(b) puts a thumb on the scale in favor of otherwise-removable aliens like Marin-Garcia. The provision reflects the legitimate and long-recognized Congressional policy of protecting the integrity of the family unit. *See I.N.S. v. Errico*, 385 U.S. 214, 220 (1966). But nothing in the constitution prohibits Congress from placing robust limits on that policy. Consistent with the expansive nature of Congress's power over immigration matters, *e.g., Diaz*, 426 U.S. 67, 78 n.12 (noting the variety of statutory provisions that distinguish between aliens and non-aliens), "it is not for this Court to question the wisdom of [Congress's] choice,"

---

[3] (...continued)

tion of citizenship by children born abroad survived heightened scrutiny, but the Court explicitly left undisturbed prior case law indicating that a lower standard governed. In any event, there is no indication that the Board has applied Section 1229b(b) based on classifications to which heightened scrutiny applies. Likewise, there is no indication that aliens are subject to removal proceedings *because* they have produced citizen-children, as would be necessary for Marin-Garcia's equal protection theory to be viable. *See Rogers v. Lodge*, 458 U.S. 613, 618 (1982) (noting that a regime that affects a greater proportion of one race than another does not run afoul of equal protection guarantees).

*Negusie v. Holder*, 555 U.S. 511, ___, 129 S. Ct. 1159, 1180 n.2 (2009), to make it difficult to establish exceptional and extremely unusual hardship under Section 1229b(b)(1)(D). *See also id.* ("'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the decision of Congress to admit or exclude aliens.") (quoting *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 339 (1909)). Moreover, even if a more searching inquiry applied, Section 1229b(b)(1)(D) would survive. If an alien could avoid the consequences of unlawful entry into the United States by having a child, it would create perverse incentives and undermine Congress's authority over immigration matters. *See Ayala-Flores v. I.N.S.*, 662 F.2d 444, 446 (6th Cir. 1981) (a contrary rule "would create a substantial loophole in the immigration laws"). Of course, Marin-Garcia has not convinced us that a more searching standard should apply, and several other circuits have ruled that the removal of an illegal alien does not work a constitutional violation on the alien's citizen-children. *See Payne-Barahona*, 474 F.3d at 2 & n.1 (collecting cases and noting that "[t]he circuits that have addressed the constitutional issue (under varying incarnations of the immigration laws and in varying procedural postures) have uniformly held that a parent's otherwise valid deportation does not violate a child's constitutional right"). To the extent our own precedent was not clear, we make it explicit today.

A couple remaining matters merit only brief mention. At one point, Marin-Garcia asserts his own claim in his petition. He argues that the proceedings before the immigration judge denied him process in the *Mathews v. Eldridge*

mold. *See* 424 U.S. 319, 334-35 (1976). A procedural due process claim cannot survive without the existence of a protected liberty or property interest. Cancellation of removal under Section 1229b(b), however, "is a discretionary form of relief, [and therefore] does not confer onto [the petitioner] a liberty or property interest." *Champion v. Holder*, 626 F.3d 952, 957 (7th Cir. 2010). Therefore, the procedural due process claim fails. Marin-Garcia also argues that removing him would unconstitutionally burden the voting rights of his daughters. It would not. If Marin-Garcia were to take his daughters to Mexico, they would be able to return to America to live and vote upon reaching the appropriate age. If they opted not return to the country, they would still be able to obtain absentee ballots pursuant to the Uniformed and Overseas Citizens Absentee Voting Act. *See* 42 U.S.C. § 1973ff *et seq*.

### III.  Conclusion

For the reasons set forth above, Marin-Garcia's petition for review is DENIED.