**LEE FOOK CHUEY, also known as Huey Gock Yut and Jimmie Huey, Petitioner,**

v.

**IMMIGRATION AND NATURALIZA- TION SERVICE, Respondent.**

**No. 24376.**

United States Court of Appeals, Ninth Circuit.

Sept. 29, 1970.

Rehearing Denied and Rehearing En Banc Denied Feb. 11, 1971.

Dissenting Opinion Feb. 22, 1971.

James M. Carter, Circuit Judge, dissented from order denying petition for rehearing and filed opinion.

Fallon, Hargreaves & Bixbey, San Francisco, Cal., for petitioner.

James L. Browning, U. S. Atty., Stephen M. Suffin, Atty., I. & N. S., San Francisco, Cal., John N. Mitchell, Atty. Gen., Washington, D. C., for respondent.

Before BARNES, HAMLEY and CARTER, Circuit Judges.

BARNES, Circuit Judge:

Petitioner seeks review of a final decision of the Attorney General entered against him in a proceeding under 8 U.S.C. § 1251(a) (2). The jurisdiction of this Court rests on § 106 of the Immigration and Nationality Act [Act], 8 U.S.C. § 1105a.

The petitioner is a native and citizen of China. On February 4, 1952, the petitioner (who was then 15 years old) entered the United States at Hawaii and was admitted as a United States citizen because of his knowingly false claim that he derived citizenship from his father. In September of 1957, petitioner voluntarily confessed before an officer of the Immigration and Naturalization Service (hereinafter "I. & N.S.") that he was not a citizen of the United States. Because of petitioner Lee's entry into the United States without inspection, he was ordered deported pursuant to § 241(a) (2) of the Act, 8 U.S.C. § 1251(a) (2).

No steps were taken to deport petitioner under this order, however. In 1965, he married a citizen of the United States and they subsequently had one child, who is a United States citizen by birth. Petitioner then moved to reopen the deportation proceedings for consideration of an application for suspension of deportation pursuant to 8 U.S.C. § 1254. After a hearing on February 16, 1967, the Special Inquiry Officer denied the application for suspension of deportation, and terminated deportation proceedings, on the ground that petitioner was entitled to the relief provided by § 241(f) of the Act, 8 U.S.C. § 1251(f).

The I. & N.S. appealed to the Board of Immigration Appeals from the decision terminating the deportation proceedings. On June 2, 1967, the Board dismissed the Appeal and later denied the Service's motion for reconsideration. At the request of the I. & N.S. the Board referred its decision to the Attorney General for review pursuant to 8 C.F.R. 3.1(h) (1) (iii). In a decision rendered May 1, 1969, the Attorney General found the petitioner deportable, and reversed the order of the Board which had affirmed the decision of the Special Inquiry Officer terminating deportation proceedings. (See Matter of Lee, Interim Decision #1960 (May 1, 1969))

Upon reversal of the Board's order, the Attorney General remanded the case to the Board for disposition of petitioner's application for suspension of deportation under 8 U.S.C. § 1254. In order to avoid any question of exhaustion of remedies, on August 28, 1969, a final administrative order was entered granting petitioner's application for suspension of deportation. This did not affect his ultimate deportability. Peti-

tioner here seeks review of the final decision and order of the Attorney General which found him to be deportable.

■■ The broad issue in this case is whether petitioner is saved from deportation by § 241(f) of the Immigration and Nationality Act, 8 U.S.C. § 1251(f), which provides:

"The provisions of this section relating to the deportation of aliens within the United States on the ground that they were excludable at the time of entry as aliens who have sought to procure, or have procured visas or other documentation, or entry into the United States by fraud or misrepresentation shall not apply to an alien otherwise admissible at the time of entry who is the spouse, parent, or a child of a United States citizen or of an alien lawfully admitted for permanent residence."

More narrowly, the issue is whether an alien who obtains entry into the United States under a false claim of citizenship can qualify as an "alien otherwise admissible at the time of entry" within the meaning of 1251(f). It was the decision of the Attorney General that an alien who does not submit himself to the statutorily required system for gathering information from aliens who seek immigrant visas cannot satisfy the "otherwise admissible" requirement of 1251(f). Petitioner contends that the Attorney General's decision is in error and is contrary to the Supreme Court's interpretation of 1251(f) in Immigration and Naturalization Service v. Errico, 385 U.S. 214, 87 S.Ct. 473, 17 L.Ed. 2d 318 (1966). The application of 1251 (f) to a fraudulent claim of citizenship has never been decided by any court.

In Errico, the Court said that "the meaning of the words 'otherwise admissible' is not obvious." (385 U.S. at 218, 87 S.Ct. at 476) In making an interpretation of these words, the Court considered the legislative history of 1251 (f), although there is little to consider. (See U.S.Code Cong. & Admin.News 1952, pp. 1754–55; U.S.Code Cong. & Admin.News 1957, pp. 2022–24; U.S.

Code Cong. & Admin.News 1961, p. 2981. See also: Errico v. Immigration and Naturalization Service, 349 F.2d 541 (9th Cir. 1965); Godoy v. Rosenberg, 415 F.2d 1266 (9th Cir. 1969), 45 Washington Law Review 637 (1970); 66 Columbia Law Review 188 (1966).

The Supreme Court held in Errico that the statute could not be literally applied in view of its broad humanitarian purpose to prevent the separation of family members. It further held that the evasion of quota restrictions cannot preclude immigrants with the required family ties from being considered "otherwise admissible."

This Court has on several occasions made the distinction between quantitative and qualitative immigration restrictions with respect to the "otherwise admissible" language. Quantitative restrictions in the immigration laws serve to limit the number of immigrants (e. g., quota restrictions) while qualitative restrictions are intended to exclude those who are mentally, morally or physically unfit or undesirable. See Godoy v. Rosenberg, supra, 415 F.2d at 1270–1271, and Muslemi v. Immigration and Naturalization Service, 408 F.2d 1196 (9th Cir. 1969). In these later cases, this Court stated that Errico establishes that the satisfaction of qualitative, not quantitative, restrictions must be the basis for determining whether an alien can be considered "otherwise admissible." These qualitative restrictions appear in the enumeration of the classes of aliens who are ineligible for admission in § 212 of the Act, 8 U.S.C. § 1182.

There is no suggestion in the government's brief or the administrative record that the petitioner comes under any of the qualitative exclusions of § 1182. The decision of the Special Inquiry Officer on February 16, 1967, found Lee to be a person of good moral character for at least seven years preceding his application for suspension of deportation. Petitioner is employed at a trade, and has no arrest record. A character investigation by the Immigration and Naturalization Service revealed nothing

adverse to petitioner (Matter of Lee, Decision of the Special Inquiry Officer, Exhibit "A" attached to Petition for Review, p. 2 (February 16, 1967)). The record therefore shows no qualitative ground upon which petitioner could be excluded from admission.

It is the government's contention, however, that § 241(f) "only encompasses fraud or misrepresentation committed by an alien in the course of furnishing information, or otherwise being processed, as required by our immigration laws." Matter of Lee, *supra*, at p. 10. The government, relying upon the Attorney General's opinion, seeks to distinguish *Errico* on the ground that in both cases decided in that opinion (*Errico* and *Scott*), the aliens did not attempt to evade completely the immigration process. The Attorney General took the position that although "each of those aliens misrepresented facts for the purpose of evading quota restrictions, each did submit himself to the statutory system for obtaining information from aliens who seek immigration visas, and presumably the information provided by each was found to satisfy all applicable immigration requirements other than those relating to his false status." Matter of Lee, *supra* at p. 9. Because of his claim of citizenship, petitioner was allowed to enter without being subjected to any screening process required of immigrants.

The government thus contends, in essence, that it has a significant interest in distinguishing the species of fraud perpetrated in *Errico* from that perpetrated by Lee in order to maintain the integrity of the immigration processing system established by the Act. In order to fulfill the requirements of the immigration laws it suggests that those aliens who wish to enter as immigrants should and must be thoroughly screened and investigated.

Against these considerations urged by the government, the interests of the alien with the requisite family ties must also be weighed, as was done in *Errico*. In it, the Supreme Court found that a major purpose of Congress in establishing § 241(f) was a humanitarian desire to keep family units together.

"Congress felt that, in many circumstances, it was more important to unite families and preserve family ties than it was to enforce strictly the quota limitations or even the many restrictive sections that are designed to keep undesirable and harmful aliens out of the country.

"In this context it is not surprising that Congress also granted relief to aliens facing exclusion or deportation because they had gained entry through misrepresentation." (385 U.S. at pp. 220–221, 87 S.Ct. at p. 478)

In discussing § 7 of the 1957 Act (of which § 241(f) is a codification), the Supreme Court said:

"The construction of the statute that we adopt in these cases is further reinforced when the section is regarded in the context of the 1957 Act. The fundamental purpose of this legislation was to unite families. Refugees from Communist lands were also benefited, but the Act principally granted relief to persons who would be temporarily or permanently separated from their nearest relatives if the strict requirements of the Immigration and Nationality Act, including the national quotas, were not relaxed for them. It was wholly consistent with this purpose for Congress to provide that immigrants who gained admission by misrepresentation, perhaps many years ago, should not be deported because their countries' quotas were over-subscribed when they entered if the effect of deportation would be to separate families composed in part of American citizens or lawful permanent residents." (385 U.S. at 224–225, 87 S.Ct. at 480)

This Court is therefore presented with a conflict between two significant interests which must be balanced and accommodated. In appraising the government's arguments, it should be noted that the purpose of the immigration processing system is to enable the govern-

ment to discover whether an alien qualifies for admission under the Congressionally declared standards. The system itself has no significance other than as a means toward achieving an important governmental end, i. e., excluding aliens who are mentally, physically or morally undesirable. The government derives no independent benefit from the mere fact that an alien undergoes the screening and investigatory procedures of the immigration system. Thus, in relation to aliens who seek relief under § 241(f), the logical purpose for the "otherwise admissible" requirement is to insure that the aliens who are allowed to remain are physically, mentally and morally fit. The ability of the government to make such determinations is the crucial issue rather than the specific procedure which is used. As a practical matter, submission by the alien to the statutory system for gathering information appears to be the most effective and expeditious manner for ascertaining such information and regulating the quality of aliens admitted.

Those aliens who misrepresented essential facts to gain entry but who possess or have subsequently acquired the required family relationships present a special case, however. Many aliens within this category, such as petitioner, evade all or a major portion of the immigration process because of their misrepresentations. Nevertheless, Congress has decided in the interests of maintaining family units that those who possess the required family relationship shall be dealt with more leniently than other violators of the immigration laws. It therefore does not appear to impose an undue burden upon the immigration process if the government is required to obtain the necessary information to determine qualitative admissibility of these aliens during the investigatory process which precedes any claim for relief under § 241(f). The government's ability to regulate the quality of immigrants would not seem to be significantly impaired by such a practice.

Even if an alien is not foreclosed from being considered "otherwise admissible" despite his avoidance of the immigration process, the government still has ample opportunity to gather the critical information it requires before a hearing on the question of whether the alien is entitled to relief under § 241(f). Under the interpretation we rely upon, the basic interests of the government and the individual are harmonized and preserved.

We realize the argument can be made that the application of § 241(f) to aliens who enter under false claims of citizenship rewards fraud and encourages the circumvention of the statutory immigration system. The Supreme Court in *Errico*, however, decided that the humanitarian claims of family unity outweigh such acts of duplicity.

The government fails to provide any convincing argument for discriminating among what is in reality different techniques of fraud. Acceptance of the government's distinction would mean that petitioner would be subject to deportation because he unwisely falsely claimed that he was a citizen rather than falsely claiming he was a skilled mechanic or the spouse of a citizen, as the aliens in *Errico* did. This Court will not base its decision on a fortuitous technical difference between the two types of fraud exposed in this petition and in *Errico*.

The Supreme Court in *Errico* emphasized that if doubt exists as to the proper construction of the statute, such doubt should be resolved in favor of the alien. (385 U.S. at 225, 87 S.Ct. 473) It reminded this Court again that deportation is a drastic measure and in the nature of a penalty. "[S]ince the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used." Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433.

The Order is reversed.

## ORDER ON PETITION FOR REHEARING

After the publication of our opinion in this case on September 29, 1970, the Immigration and Naturalization Service petitioned for a rehearing and suggested a rehearing *en banc*. The case was originally submitted on briefs without oral argument. At the time, the government stood on the decision of the Attorney General below and did not put forward its own arguments. In its petition, however, it now represents that the issue in this case is one of first impression and of exceptional importance to the effective administration of the immigration laws. We then asked the petitioner who prevailed in the earlier opinion to file a response. After a thorough consideration of the arguments pressed by both parties, we believe the decision of this panel to be correct in all respects, and, therefore, deny the petition for a rehearing.

 Initially, despite the government's efforts to create the specter of possible "horribles", we must point out that we are only called upon to decide this specific case, and not the general scope of 241(f). (8 U.S.C. § 1251(f)). Secondly, the government's brief implies that this panel misconceived the question at issue. We have always understood that a cardinal principle of statutory interpretation is that Congressional enactments should be read as rational, coherent and purposeful elaborations of legislative policy. They should never be construed as establishing statutory schemes which are illogical, unjust or capricious. We may never ascribe to Congress an intent to provide different rules in functionally similar situations, involving important individual interests such as the right to remain in this country with one's family, based on purely fortuitous factual differences. Proceeding on this basis, the opinion of this panel sought to discover whether a distinction based upon reasoned principles could and should validly be drawn between the case of petitioner and those in Immigration and Naturalization Serv-

ice v. Errico, 385 U.S. 214, 87 S.Ct. 473, 17 L.Ed.2d 318 (1966). Contrary to the government's position, we believe such an inquiry is absolutely essential in determining whether Congress intended that the petitioner be eligible for the relief offered in 241(f).

 As a preface to the argument, the government suggests that 241(f) should not apply because Chuey was charged under 241(a) (2) rather than 241(a) (1). Section 241(f) has consistently been held to waive "any deportation charge that results directly from the misrepresentation regardless of the section of the statute under which the charge was brought, provided that the alien was 'otherwise admissible' at the time of entry." *Errico, supra* at 217, 87 S.Ct. at 476.

1. The government next contends that the panel gave undue weight to the legislative intent to promote family unity, *i. e.* that the "fundamental purpose of this legislation was to unite families", as the Supreme Court has said. It also argues that a close reading of related sections of the Immigration and Naturalization Act (herein "the Act") disclosed that Congress intended that those in the situation of the petitioner must rely upon other remedies.

Our reading of *Errico, supra,* other cases, and the legislative history assures us that the weight we accorded the interest in family unity did not exceed that intended by Congress. Our reading of the sections of the Act cited by the government discloses that its brief relies upon provisions which are either clearly distinguishable from, or not applicable to, the case at bar.

The government's argument relies primarily upon 212(e), (g), (h), (i), 244 and 245 of the Act, (8 U.S.C. §§ 1182(e), (g), (h), (i), 1254 and 1255). Section 212(e) deals only with the problem of preventing what has been characterized as a "brain-drain" from underdeveloped countries to our own. The family hardship dispensation was intended to alleviate possible hardships

created by the strict immigration rules applied to these visitors. Thus, it clearly has little bearing upon this case because it is based upon differing and independent governmental policies. Similarly, subparts (h) and (i) of 212 also provide no guidance because they apply only to those with the requisite family ties who are not "otherwise admissible".

The government relies heavily on the remedy of adjustment of status found in Section 245, (8 U.S.C. § 1255), which it claims is frequently used in cases such as this. Reliance upon this section, however, misleads more than it clarifies because its provisions contain no requirement of family relationship. Our reading of the suspension of deportation provisions contained in 244(a) of the Act (8 U.S.C. § 1254(a)) also fails to disclose that this panel has accorded 241(f) an "anomalous scope". First, the extreme hardship required may result to the alien alone. Family relationship is one ground for invoking administrative discretion but is not a mandatory requirement as it is in 241(f). Furthermore, while 244(a) requires good moral character, it does not provide that the alien be "otherwise admissible". It can be surmised from this that Congress intended to save certain aliens who are not "otherwise admissible" when their deportation would cause extreme hardship.

■ Our examination of the statutory provisions urged by the government indicates to us that they were either not intended to apply to petitioner's case, or that discretion was intended to be exercised in cases possessing special factors not present here. In no way does the statutory scheme point toward or compel the limitation of relief under 241(f) only to those who submitted themselves, albeit fraudulently, to the immigrant visa issuing process.

■ 2. The government next contends that 241(f) does not waive the documentary grounds for inadmissibility of an immigrant who entered without an immigrant visa. We find this argument untenable. As we wrote in the first opinion and repeated earlier, the cases unmistakably hold that 241(f) waives not only 212(a) (19), 8 U.S.C. § 1182(a) (19), but all quantitative immigration restrictions. See *Errico*, *supra*, and Muslemi v. I.N.S., 408 F.2d 1196, 1199 (9th Cir., 1969).

In addition, an immigrant visa obtained by misrepresentation is invalid. It makes little sense for the government to argue strenuously that an alien with an invalid visa (which is equivalent to no visa) should somehow be preferred to an alien without any visa.

3. This argument leads directly to the government's last claim. It argues that the decision of our panel will have a deleterious effect upon the enforcement of the immigration laws. In its first brief and now on rehearing, we think the government refuses to face the reality of the situation. Almost invariably, by the time that the relief provision of 241(f) is invoked, the integrity of the immigrant visa system has been long violated. Section 241(f) deals with the problem after the breach has occurred. When Congress enacted this provision, it was reconciling strong and conflicting policies. Congress was dealing with problems arising from violations of the visa system, and had to do so in the context of ongoing family ties and expectations which had developed for many years after the breach. Without placing blame, we believe Section 241 (f) as we have interpreted it, is the result of the ineffective enforcement of the immigration laws, not the cause of it.

The government's brief also refuses to recognize that in many cases, the misrepresentation renders the safeguards of the immigrant visa system worthless. For example, when the alien misrepresents his identity during the visa issuing process, the information elicited from him is often valueless. When the fraud is discovered, the information derived from the visa process which was tainted by the misrepresentation, may be useless or have little or no bearing upon the ultimate disposition

of the case. In such a context, a claim that a reasoned distinction between these two species of fraud can be drawn is possibly less than tenable and certainly less than candid. When § 241(f) is invoked, the immigration processing system has already proved ineffective. Congress made the wholly reasonable choice that the interest in family unity outweighs the deterrent effects of a more draconian policy. This was the holding in *Errico* which, so long as it remains the law, governs our decision.

The Petition for Rehearing is denied.

If our construction of the statute presents insuperable problems, the proper remedy is to seek amendatory legislation.

JAMES M. CARTER, Circuit Judge (dissenting).

I vote to grant the government's petition for rehearing, and the petition to hear *en banc*.

### ORDER

A majority of the panel as constituted in the above case has voted to deny the petition for rehearing and to reject the suggestion for a rehearing *en banc*, Judge Carter dissenting.

The full court has been advised of the suggestion for an *en banc* hearing and of the panel vote, and a majority of the judges of the court has voted to deny a rehearing *en banc* (Fed.R. App.P. 35(b)); Judges Carter and Wright voting for a rehearing and a hearing *en banc*.

The petition for rehearing is denied and the suggestion for a rehearing *en banc* is rejected, in accordance with the "Order on Petition for Rehearing" filed herein this date.

JAMES M. CARTER, Circuit Judge, dissenting from Order Denying Petition for Rehearing and Hearing In Banc.

I originally concurred in the well written opinion prepared by my brother Barnes, in the above case. Thereafter, the Attorney General filed a strong and convincing petition for rehearing and suggestion for rehearing in banc. That petition convinced me and several of my colleagues, the case should be heard in banc.

The panel has now issued an order denying the petition for rehearing and a majority of the judges in active service have rejected the suggestion for a rehearing in banc. I dissent from the order denying the petition for rehearing, and rely for my dissent on the grounds set forth in the excellent presentation made by the Attorney General in the petition for rehearing; and on the case of United States v. Osuna-Picos (D.C. So.Dist. Cal.1970) 319 F.Supp. 558, written by Judge Turrentine.