**Robert REID and Nadia Alice Reid, Petitioners,**

**v.**

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 171, Docket 73–1067.**

United States Court of Appeals, Second Circuit.

Argued Nov. 21, 1973.

Decided Feb. 13, 1974.

Benjamin Globman, Hartford, Conn. (Globman & Cooper, Hartford, Conn., of counsel), for petitioners.

Stanley H. Wallenstein, Sp. Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y., Joseph P. Marro, Asst. U. S. Atty., New York City, of counsel), for respondent.

Before LUMBARD, MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

Petitioners, Mr. & Mrs. Robert Reid, are natives and citizens of British Honduras who entered the United States at Chula Vista, California, which is on the Mexican border, falsely representing themselves to be United States citizens, with the result that they were not inspected as aliens by a United States immigration officer. Mr. Reid entered on November 29, 1968, and Mrs. Reid on January 3, 1969. Thereafter Mrs. Reid gave birth in the United States to two sons, one born on November 2, 1969, and the other on April 4, 1971, each of whom is a native born citizen of the United States.

On November 22, 1971, the Immigration and Naturalization Service ("INS") began deportation proceedings against the Reids, alleging that they were deportable under § 241(a)(2) of the Immigration and Nationality Act ("Act"), 8 U.S.C. § 1251(a)(2)[1] as aliens who entered the United States without inspection as immigrants. At a hearing held on December 13, 1971, before a special inquiry officer the Reids conceded the essential allegations of the INS order to show cause, admitting that they had entered the United States by falsely claiming to be United States citizens and that upon entry they had not presented themselves to an INS officer for inspection as aliens. However, they contended that their deportation was precluded by § 241(f) of the Act, 8 U.S. C. § 1251(f), an ameliorative statute which waives deportation in the case of fraudulent entry by aliens otherwise admissible into the United States who have close family ties with United States citizens. The ties relied upon by them were their two children born in the United States after the Reid's illegal entry.

Holding that § 241(f) was inapplicable, the special inquiry officer sustained the charge that the Reids were deportable on the ground that they had entered the United States without inspection. By order entered on May 8, 1972, he granted them voluntary departure in lieu of deportation and directed that they be deported to British Honduras in the event that they did not depart. On appeal the Board of Immigration Appeals by order entered on December 12, 1972, affirmed the special inquiry officer's order and dismissed the appeal, holding § 241(f) to be inapplicable. This petition for review followed, our jurisdiction being invoked pursuant to §

---

1. "§ 1251. Deportable aliens—General classes

"(a) Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—

\* \* \* \* \*

"(2) entered the United States without inspection or at any time or place other than as designated by the Attorney General or is in the United States in violation of this chapter or in violation of any other law of the United States; . . . . "

106 of the Act, 8 U.S.C. § 1105a. For the reasons stated below the petition is dismissed.

## DISCUSSION

The broad issue before us is whether § 241(f) of the Act, which concededly applies to aliens who gain entry as the result of fraud in obtaining immigrant visas or fraud upon being inspected as immigrants at the point of entry, see Immigration and Naturalization Service v. Errico, 385 U.S. 214, 87 S.Ct. 473, 17 L.Ed.2d 318 (1966), also applies to aliens who enter by fraudulently posing as United States citizens. Section 241(f) provides in pertinent part:

"(f) The provisions of this section relating to the deportation of aliens within the United States on the ground that they were excludable at the time of entry as aliens who have sought to procure, or have procured visas or other documentation, or entry into the United States by fraud or misrepresentation shall not apply to an alien otherwise admissible at the time of entry who is the spouse, parent, or a child of a United States citizen, or of an alien lawfully admitted for permanent residence."

On its face the language of the statute does not appear to limit the type of fraud or misrepresentation that will be waived or the status claimed by the entrant. Reading the statute literally, therefore, one might conclude that as long as the alien was "otherwise admissible" at the time of entry the species of fraud or nature of the entry is immaterial. But, as Learned Hand has wisely warned, "[I]t is commonplace that a literal interpretation of the words of a statute is not always a safe guide to its meaning," Peter Pan Fabrics Inc. v. Weiner Corp., 274 F.2d 487, 489 (2d Cir.

1960). Even more appropriate for present purposes are his remarks in Guiseppi v. Walling, 144 F.2d 608, 624 (2d Cir. 1944) (concurring opinion), where he stated:

"It does not therefore seem to me an undue liberty to give the section as a whole the meaning it must have had, in spite of the clause with which it begins. . . . There is no surer way to misread any document than to read it literally; in every interpretation we must pass between Scylla and Charybdis; and I certainly do not wish to add to the barrels of ink that have been spent in logging the route. As nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how they would have dealt with the unforeseen situation; and, although their words are by far the most decisive evidence of what they would have done, they are by no means final." (144 F.2d at 624.)

See also Federal Deposit Ins. Corp. v. Tremaine, 133 F.2d 827, 830 (2d Cir. 1943) (L. Hand, C. J.). ("There is no surer guide in the interpretation of a statute than its purpose when that is sufficiently disclosed; nor any surer mark of over solicitude for the letter than to wince at carrying out that purpose because the words used do not formally quite match with it.") Apparently the Supreme Court had these principles of statutory construction in mind in *Errico, supra,* where it rejected a literal application of § 241(f), which would limit it to cases where an alien is charged with fraud in violation of § 212(a)(19) of the Act, 8 U.S.C. § 1182(a)(19),[2] concluding that it "cannot be applied with strict literalness," 385 U.S. at 217, 87 S.Ct. at 476, since to do

---

2. "§ *1182. Excludable aliens—General classes*

"(a) Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

\*　　\*　　\*　　\*　　\*

"(19) Any lien who seeks to procure, or has sought to procure, or has procured a visa or other documentation, or seeks to enter the United States, by fraud, or by willfully misrepresenting a material fact;
. . . . "

so would frustrate Congress' purpose in enacting it and would deny relief in cases where it was intended to be made available. There appears to be no reason for not using the same approach in determining whether a literal reading would expand the statute's application beyond that intended by its drafters.

The legislative history of § 241(f) reveals a desire on the part of Congress to avoid the tragic destruction of family unity that might occur where an alien who fraudulently entered the United States as an immigrant, either by procuring the issuance of an immigration visa through misrepresentation or by deceiving those charged with examination and inspection of immigrants upon entry, later became the spouse, parent or child of a United States citizen in the United States, with whom he then established a family. Prior to the adoption of the statute and its predecessor, § 7 of the Immigration Act of 1957, P.L. 85–316, 71 Stat. 640, our immigration laws [3] had mandated deportation of immigrants who gained admission through misrepresentation, even when made to escape persecution in the alien's country of national origin and even though, with the passage of time, the immigrant had established a family in the United States. The 1957 Act, which was incorporated into the current statute by §§ 15 and 16 of the Act of September 26, 1961, P.L. 87–301, 75 Stat. 650, alleviated the harshness of these earlier laws by relieving such immigrants of deportation charges based on entry gained by fraud provided they were otherwise admissible

at the time of entry. See House Committee Report on the 1957 Act (H.R. Rep. 1199, 85th Cong., 1st Sess.) and H. R.Rep. 1086, 87th Cong., 1st Sess., p. 37.

Nothing in the text or history of § 241(f) indicates an intent on Congress' part to waive the essential substantive and procedural steps to which an alien must submit himself in order to obtain a visa and enter the United States. On the contrary the history and language of the statute disclose that Congress assumed that the waiver provision would apply only to immigrants who underwent the screening process. Its intent in this respect is evidenced by its direction to the INS in mandatory terms to inspect aliens seeking to enter the United States, 8 U.S.C. § 1225(a),[4] whereas no such mandate was enacted with respect to interrogation of returning United States citizens. This intent was further implied by Congressman Celler, Chairman of the Judiciary Committee of the House of Representatives, when, in commenting on the original waiver provision (later adopted as § 7 of the 1957 Act), he stated:

"This section also provides for leniency in the consideration of visa applications made by close relatives of United States citizens and aliens lawfully admitted for permanent residence who in the past may have *procured documentation for entry by misrepresentation*" (emphasis supplied) 103 Cong.Rec. 16301.

Similarly Senator Eastland, Chairman of the Senate Judiciary Committee, in commenting on those sections of the 1961

---

3. Section 10 Displaced Persons Act of June 25, 1948, 62 Stat. 1013, § 11(e) Refugee Relief Act of August 7, 1953, 67 Stat. 405 and § 212(a)(19), Immigration and Nationality Act of 1952, 8 U.S.C. § 1182(a)(19).

4. "§ *1225. Inspection by Immigration Officers—Powers of officers*
    "(a) The inspection, other than the physical and mental examination, of aliens (including alien crewmen) seeking admission or readmission to or the privilege of passing through the United States shall be

conducted by immigration officers, except as otherwise provided in regard to special inquiry officers. All aliens arriving at ports of the United States shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as he may prescribe. Immigration officers are authorized and empowered to board and search any vessel, aircraft, railway car, or other conveyance, or vehicle in which they believe aliens are being brought into the United States."

bill incorporating the previous waiver provisions in the current statute stated:

"Sections 13, 14, 15 and 16 of the bill also incorporate into the basic statute provisions which have been contained in separate enactments. Those provisions relate to the waiver of grounds of inadmissibility and deportability in the cases of certain close relatives of U.S. citizens and lawful permanent residents involving convictions of minor criminal offenses, fraudulent misrepresentations *in connection with applications for visas or admission to the* United States." (Emphasis supplied) 107 Cong.Rec. 19653–19654.

In short, Congress was concerned with fraud on the part of persons seeking to enter *as aliens.* An alien, whether seeking entry as an immigrant or as a nonimmigrant (e. g., temporary visitor, temporary worker, foreign official, treaty alien, or the like) must first apply to the proper American authority abroad for a visa (immigrant or non-immigrant) or other prescribed documentary permission to enter. Next he must submit himself at the point of entry to an INS official for "inspection" as an alien. See Gordon and Rosenfield, Immigration Law and Procedure (1972) §§ 3.1 to 3.28, and 8 U.S.C. § 1225(a). Accordingly Congress, in enacting § 241(f), concerned itself with the two points in the immigration screening and inspection process where fraud might occur: (1) the procurement of "visas or other documentation" and (2) the "entry."[5]

There is no evidence that Congress had in mind extending the waiver of deportation to an attempt to by-pass completely this immigration screening process and required "inspection" of aliens at the border. If petitioners had entered the United States *as aliens* and had not falsely claimed to be citizens they would have been required first to undergo a screening process designed to ascertain whether they were admissible and to have submitted to an "inspection" of them at the border. To attempt years later to reconstruct the information that would have been obtained from that process in order to ascertain whether they would have been "otherwise admissible" *at the time of entry* is extremely difficult, if not impossible.

Petitioners concede that regardless how § 241(f) is construed they would be deportable under § 241(a)(1) of the Act, 8 U.S.C. § 1251(a)(1), unless they successfully bore the burden of establishing that *at the time of entry* they satisfied the substantive, qualitative requirements for admission into the United States as prescribed by § 212(a) of the Act, 8 U.S.C. § 1182(a) and thus would be "otherwise admissible" as that term is used in § 241(f). Section 212(a) lists a series of 31 classes of aliens who shall be ineligible for admission, including among others the insane or mentally retarded, drug addicts, those having contagious disease, the physically disabled, paupers, those convicted of certain offenses, polygamists, prostitutes, laborers likely to adversely affect employment of workers in the United States, and those likely to become public charges if admitted.

Enforcement of § 212(a) requires the Government to undertake a thorough and detailed investigation of each applicant for entry into the United States as an immigrant, which begins with his application to the United States consul in a foreign country for an immigrant visa. At that point the applicant is examined medically to determine whether health requirements are met. Birth and police records are examined to insure that other requirements are satisfied. A passport must be furnished by the applicant and he must furnish fingerprints and sworn answers to detailed questions regarding his residence, prior criminal

---

5. The definition of "entry" as "any coming of an alien into the United States," 8 U.S.C. § 1101(a)(13), is not inconsistent with the intent to refer to such "coming" in the capacity of an alien or immigrant.

record, military service, diseases, arrests, employment, skills, narcotics use, organizational memberships, ability to read and prospective means of support in the United States. Following this investigation the consular officer, after interviewing the applicant and reviewing his sworn application and supporting proof, must decide whether to grant or deny a visa and he must record his decision on a prescribed form. See Gordon & Rosenfield, Immigration Law & Procedure, § 3–8b, p. 3–57 (1973).

■ The United States consular officer is given broad discretionary authority in ruling upon visa applications. For instance, applications may be denied because the "aliens . . ., in the opinion of the consular officer at the time of application for a visa . . . are likely at any time to become public charges," 8 U.S.C. § 1182(a)(15), because they are aliens "who the consular officer . . . knows or has reason to believe seek to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety or security of the United States," 8 U.S.C. § 1182(a)(27), or because they are aliens who "the consular officer . . . knows or has reasonable ground to believe probably would, after entry (A) engage in activities which would be prohibited by the laws of the United States relating to espionage, sabotage, public disorder . . . or (B) engage in any activity a purpose of which is . . . the control or overthrow of the Government of the United States, by force, violence, or other unconstitutional means. . . ." 8 U.S.C. § 1182(a)(29).

■ Assuming that a visa is issued by the American consul to an immigrant, the visa still represents only prima facie evidence of eligibility and does not assure the holder of admission into the United States. Upon arrival at the port of entry the alien is again examined, this time by INS officers who are also given broad authority to exclude him if found inadmissible. Again the immigrant is examined medically, undergoing quarantine inspection by medical officers of the Public Health Service, 42 C.F.R. § 71.136–141, who must also determine whether the alien has any physical or mental afflictions, in which event he may be detained or excluded by the Attorney General. The alien is interrogated by immigration inspectors with respect to the various grounds of ineligibility listed in 8 U.S.C. § 1182 and the documentary evidence as to his admissibility is again reviewed. If the inspector concludes that the immigrant is ineligible for admission or if he is in doubt, he may detain the alien for further inquiry or an exclusion proceeding, at which the applicant bears the burden of establishing his admissibility, 8 U.S.C. § 1361.

In contrast to the foregoing detailed screening process developed for determination of the admissibility of immigrants, the returning United States citizen needs only to furnish evidence of his citizenship, usually in the form of a passport. Lesser evidence is required upon re-entry through land portals. While the inspector has the right to determine whether the citizenship claim appears to be valid, United States ex rel. Lapides v. Watkins, 165 F.2d 1017 (2d Cir. 1948), for obvious reasons the examination of re-entering citizens must of necessity be limited as compared with the detailed inspection of aliens seeking entry. Gordon & Rosenfield, Immigration Law & Procedure, § 3.16b, p. 3–93 (1973). To suggest, as does our dissenting brother, that since the INS has the power to verify a claim of United States citizenship made by an entrant, "the solution is in tightened security" overlooks the fact that with over 100 million American citizens re-entering the United States annually, of whom more than 95 million enter through bor-

der land portals,[6] a detailed investigation into the citizenship of each returnee would threaten to paralyze international travel on the part of American citizens.

Confronted with the burden of establishing that but for their fraud they were "otherwise admissible" at the time of entry petitioners, relying principally upon the Ninth Circuit's decision in Lee Fook Chuey v. INS, 439 F.2d 244 (9th Cir. 1971), suggest that they should now be permitted *nunc pro tunc* to show that if they had gone through the regular immigration screening process several years ago they would have been found to be admissible. Were we dealing solely with simple objective facts that could be easily ascertained after the passage of years, such as information recorded in birth or death records, it might be feasible to make a retroactive determination of an alien's qualitative admissibility. But a mere review of the numerous grounds specified by Congress as the bases for finding the alien to be ineligible to receive a visa or for excluding him upon attempted entry persuades us that a *post hoc* investigation would not be an adequate substitute for the exhaustive contemporaneous probe and examination required of the consular and INS services. In many if not most cases where § 241(f) is invoked an inquiry of the type suggested by petitioners could not be instituted until years after the alien's fraudulent entry, since the essential familial relationship would not have been established at an earlier point in time. With the passage of time it would be difficult if not impossible, for instance, for the United States consul at the alien's country of residence to state whether he would have denied a visa on the ground that in his opinion the alien would have been likely to become a public charge if admitted into the United States, see 8 U.S.C. § 1182(a)(15).

For these reasons we are satisfied that Congress did not intend to permit § 241(f), particularly in view of its language and legislative history, to be utilized by an alien who had completely circumvented the elaborate immigration visa and screening system established by the Act, thus failing to satisfy any of its requirements at the time of entry. So to hold would in our view be unnecessarily to erode an essential procedure which has been painstakingly developed for the purpose of screening out those barred from admission on carefully considered qualitative grounds. While § 241(f) may be invoked by an immigrant who gained entry as the result of his misrepresentation of some specific fact sought to be elicited in the screening process, this is a far cry from the wholesale fraud implicit in the complete by-passing of that process. To waive deportation for such fraud would seriously weaken the effectiveness of our immigration laws.

Aside from these circumstances showing that Congress did not intend in enacting § 241(f) to by-pass the immigration screening process, petitioners' entry under false claims of citizenship at Chula Vista precluded any "inspection" of them as that term is used in 8 U.S.C. §§ 1225(a) and 1251(a)(2).

If petitioners had not falsely claimed to be citizens, there would have been an "inspection" of them at the border. The initial question faced by us is whether the fact that immigration officials saw them at the time when they falsely claimed to be citizens at Chula Vista constituted an "inspection" within the meaning of 8 U.S.C. §§ 1225(a) and 1251(a)(2). Faced with this issue two circuits have held, in construing another section of the Act, that there was no "inspection" when an alien gained admittance by falsely representing himself to be an American citizen. Goon

6. According to the 1972 Annual Report of the Immigration and Naturalization Service, page 25, 105,439,188 citizens entered the United States under claim of citizenship during the year from June 30, 1971 to June 30, 1972, of which 95,209,861 were border-crossers.

Mee Heung v. INS, 380 F.2d 236 (1st Cir.), cert. denied, 389 U.S. 975, 88 S.Ct. 479, 19 L.Ed.2d 470 (1967); Ben Huie v. INS, 349 F.2d 1014 (9th Cir. 1965).

"There is, unfortunately, no definition of the term 'inspection' anywhere in the act. In addition to section 1255(a), section 1251(a)(2) uses the term in providing that anyone who enters the United States without inspection shall be subject to deportation. Some cases under this section and its predecessors have held that false statements to immigration inspectors have the effect of preventing meaningful inspection and, accordingly, render an alien deportable. E. g., United States ex rel. Volpe v. Smith, 7 Cir., 1933, 62 F.2d 808, aff'd on other grounds, 289 U.S. 422, 53 S.Ct. 655, 77 L.Ed. 1298. Others have held to the contrary. E. g., Ex parte Gouthro, E. D., Mich., 1924, 296 F. 506, aff'd sub nom. United States v. Southro, 6 Cir., 1925, 8 F.2d 1023. We find no case, however, holding that the acceptance of a false claim to United States citizenship, enabling an alien to enter the country without registering as an alien, constitutes inspection, or is equivalent to having been inspected. See, e. g., Ben Huie v. INS, 9 Cir., 1965, 349 F.2d 1014." Goon Mee Heung v. INS, 380 F.2d at 236–237.

Relying on *Errico* and *Lee Fook Chuey,* petitioners urge, in an argument that has been accepted by our dissenting brother Judge Mulligan, that the humanitarian interest in family unity overrides the concern for a procedural system designed to insure immigration law enforcement. It is true that in *Errico* the Supreme Court, in construing § 241(f), relied in part upon Congress' humanitarian purpose. However, that case dealt with aliens who had subjected themselves to the immigrant visa issuance process and not with aliens who, like petitioners, had completely by-passed that process. Furthermore, the issue in *Errico*—whether a quota fraud (as distinguished from a fraud with respect to qualitative admissibility) precludes

an alien from being "otherwise admissible"—was a limited one. The suggestion that the Supreme Court implied that § 241(f) might be available to deprive the consular service and INS of any opportunity to screen entering aliens reads too much into *Errico*.

The argument that § 241(f) must apply here as a matter of humanitarianism because of the hardship that deportation might work upon the two children who became American citizens as a result of petitioners' fraud ignores the existence of other sections of the Act which authorize the Attorney General, subject to certain specified conditions, to suspend or waive a deportation that would result in "extreme" or "exceptional and extremely unusual" hardship to the alien or to his close relatives in the United States. See, e. g., 8 U.S.C. §§ 1182(e), (h) and 1254. If § 241(f) were construed to mandate such relief whenever entry is gained under a false claim of citizenship, the discretionary and conditional waiver of deportability carved out by these other sections of the Act would in such cases largely be rendered superfluous. Furthermore, solicitous as we all are for the welfare of the two young American citizens here involved, we cannot overlook the fact that if such hardships were the sole test, deportation would automatically be waived in numerous similar cases, such as where an alien surreptitiously enters the United States and raises a family here. Yet such aliens are deportable, see, e. g., Gambino v. INS, 2 Cir., 419 F.2d 1355, cert. denied, 399 U.S. 905, 90 S.Ct. 2195, 26 L. Ed.2d 559 (1970), relegating the parties to the aforementioned provisions of the Act authorizing discretionary waiver in hardship cases. We believe the same principles govern here.

In *Lee Fook Chuey* the Ninth Circuit, faced with the issue here confronted, held that § 241(f) could be invoked by an alien who obtained entry into the United States upon a false claim of citizenship. It reasoned that the interest in family unity outweighed that of maintaining the integrity of the immigration

processing system established by the Act and that it would not ascribe to Congress an intent to limit § 241(f) to misrepresentations in the immigration process as distinguished from a by-passing of that process, since both situations were "functionally similar." With due deference to the distinguished Ninth Circuit we must respectfully disagree. In our view the court in *Lee Fook Chuey* failed to give adequate weight to the purpose of § 241(f) as reflected in its legislative history and to the essential part played by the immigration screening process in determining whether an alien who gains entry by fraud is "otherwise admissible." Furthermore the decision appears to be inconsistent with other decisions denying availability of § 241(f) to aliens seeking to avoid deportation under functionally similar circumstances. In Monarrez-Monarrez v. INS, 472 F.2d 119 (9th Cir. 1972), for instance, the court, following our decision in Gambino v. INS, 2 Cir., 419 F.2d 1355, cert. denied, 399 U.S. 905, 90 S.Ct. 2195, 26 L.Ed.2d 559 (1970) (stowaway), held that § 241(f) does not apply to an alien who surreptitiously enters the United States, thus completely avoiding the immigration screening process, and establishes a family here. Although there is no legally significant distinction between the two types of entries, the effect, assuming both aliens are otherwise admissible, is to reward the alien who by-passed the screening process by representing himself to be a citizen but to deport the alien who did not present himself at the border and thus did not resort to such a brazen device. In similar analogous situations § 241(f) has also been held inapplicable. In Bufalino v. INS, 473 F.2d 728 (3d Cir.), cert. denied, 412 U.S. 928, 93 S.Ct. 2751, 37 L. Ed.2d 155 (1973), the Third Circuit, holding § 241(f) inapplicable to an alien's re-entry into the United States upon a false claim of citizenship, stated:

"A false claim of citizenship obviously frustrates a major policy of our immigration law which is the inspection of aliens. This petitioner not only brazenly pretended to be a United States citizen but used that lying assertion to leave and return to the United States on at least three occasions without being inspected as the alien he was and is.

". . . In situations involving 'otherwise inadmissible,' there is nothing in Errico to justify the waiver of the documentary requirements for entry as petitioner seeks here. Matter of K, 9 I. & N. Dec. 585 (B.I.A.1962). This court in Bufalino v. Holland, 277 F.2d 270 (3 Cir. 1960), cert. den. 364 U.S. 863, 81 S.Ct. 103, 5 L.Ed.2d 85 held that under 8 U.S.C. § 1251(a)(5), petitioner was 'otherwise inadmissible' at the time of the entry in question. 277 F.2d at 278. Errico dealt with a problem where the fraudulent citizenship representations were made to circumvent quota restrictions and not to destroy the primary purpose of the regulation, which was to force alien inspection (as in the instant matter)." 473 F.2d at 731–732.

Our view that an alien entering the United States under a false claim of American citizenship should not be treated as one gaining entry as an alien but like one surreptitiously entering the United States finds support in Goon Mee Heung v. INS, *supra*, where the court stated:

"Whatever the effect other misrepresentations may arguably have on an alien's being legally considered to have been inspected upon entering the country, we do not now consider; we are here concerned solely with an entry under a fraudulent claim of citizenship. Aliens who enter as citizens, rather than as aliens, are treated substantially differently by immigration authorities. This examination to which citizens are subjected is likely to be considerably more perfunctory than that accorded aliens. Gordon & Rosenfield, Immigration Law and Procedure § 316d (1966). Also, aliens are required to fill out alien registration forms, copies of which are retained by the immigration authorities.

8 C.F.R. §§ 235.4, 264.1; 8 U.S.C. §§ 1201(b), 1301–1306. Fingerprinting is required for most aliens. 8 U.S.C. §§ 1201(b), 1301–1302. The net effect, therefore, of a person's entering the country as an admitted alien is that the immigration authorities, in addition to making a closer examination of his right to enter in the first place, require and obtain information and a variety of records that enable them to keep track of the alien after his entry. *Since none of these requirements is applicable to citizens, an alien who enters by claiming to be a citizen has effectively put himself in a quite different position from other admitted aliens, one more comparable to that of a person who slips over the border and who has, therefore, clearly not been inspected."* (380 F.2d at 237) (Emphasis added).

In our view there comes a point where, in construing § 241(f), the integrity of the immigration visa and inspection procedure outweighs the interest in giving relief to certain aliens who have entered this country by unlawful means and raised families here. We believe that that point has been reached here. When due consideration is given to the thousands of aliens who are required to follow the established screening process, it would be inequitable to expand § 241(f) to benefit conduct that would wholly evade and stultify that process. The effect could be to encourage disregard for the immigration laws and to render them ineffective since no practical opportunity would be afforded to the I.N.S., in the case of an alien posing as a United States citizen, to conduct an investigation comparable to that mandated in the case of an immigrant seeking entry as such.

The petition for review is dismissed.

MULLIGAN, Circuit Judge (dissenting):

The issue before us is whether an alien who obtains entry into this country by falsely claiming United States citizenship, can qualify as "an alien otherwise admissible at the time of entry," within the meaning of Section 241(f) of the Immigration and Nationality Act, 8 U.S.C § 1251(f). An alien "otherwise admissible" is shielded from deportation despite his fraudulent entry if "he is the spouse, parent, or a child of a United States citizen." Mr. and Mrs. Reid, the petitioners here, are admittedly aliens and citizens of British Honduras. They did enter the United States at Chula Vista, California, falsely posing as American citizens. They have since become the parents of two sons who were born here and are citizens of the United States. There is no contention and indeed no evidence that they were not "otherwise admissible at the time of entry." They therefore literally fulfill the requirements of the statute, and yet the Immigration and Naturalization Service (INS) has ordered their deportation and has persuaded a majority of this court to dismiss the petition to review the order. I do not agree and must dissent.

INS has taken the position that the protection of the statute is extended only to those aliens who present themselves as aliens with fraudulent visas. Otherwise, we are advised, the elaborate system of visa issuance might be eroded. The difficulty with this position, which has been adopted by the majority, is of course that the statute makes no such distinction and the only other court to face the identical question has ruled that there is no such distinction. Lee Fook Chuey v. INS, 439 F.2d 244 (9th Cir. 1971).[1] The statute is not limited to

---

1. I do not overlook Bufalino v. INS, 473 F. 2d 728 (3d Cir.), cert. denied, 412 U.S. 928, 93 S.Ct. 2751, 37 L.Ed.2d 155 (1973), cited by the majority for the proposition that the Third Circuit has held that Section 241(f) is inapplicable to an alien's reentry into the United States on a false claim of citizenship. Judge McLaughlin's opinion, containing the

language relied upon, expressed his view only. The separate concurring opinion of Judge Adams, concurred in by Judge Van Dusen, dismissed the petition for review there on other grounds and specifically found it unnecessary to determine the applicability of Section 241(f). See 473 F.2d at 739 n. 4.

fraudulent visa-bearers but in so many words applies to those persons who have "procured visas or other documentation, *or* entry into the United States by fraud or *misrepresentation.*" (emphasis added).

Although the language of the statute is clear, the majority opinion, which apparently concedes that the Reids are literally within its protection, seeks to avoid the provision, invoking the shades of Learned Hand for the general proposition that it is somewhat dangerous to read the language of a statute literally. It is at least equally dangerous to take Learned Hand literally, without examining the problems of construction involved in the case he was deciding.[2] Even the quoted excerpt from Giuseppi v. Walling, 144 F.2d 608, 624 (2d Cir. 1944), indicates that Judge Hand was referring to an "unforeseen situation," not contemplated by the draftsmen of the statute. He still observed that the words employed are "by far the most decisive evidence" of the intent of the authors.

I cannot possibly imagine, in any event, that it was unforeseen that an alien might seek to gain entry to the United States by posing as a citizen. The alien can secure admission fraudulently either with a visa procured by misrepresentation or by falsely posing as an American citizen. The latter alternative could not realistically have been overlooked by the Congress and the language of the statute covers both situations.

In support of the position of INS, the majority argues that the Supreme Court "apparently" had the Hand principles of statutory construction in mind when it refused to apply Section 241(f) literally in INS v. Errico, 385 U.S. 214, 87 S.Ct. 473, 17 L.Ed.2d 318 (1966). If the

Court had the Hand "principles" in mind in that case, it concealed that fact from all but the clairvoyant. The Court made no secret of its approach to the statute when it decided that an alien who misrepresented his status for the purpose of evading quantitative quota restrictions, was nonetheless entitled to the protection of Section 241(f). The Court eschewed a literal interpretation which would have been fatal to the alien's case because it found that the major purpose of the statute was humanitarian—the preservation of family ties and the family unit. The Court also stated that a statute mandating deportation must be construed in favor of the alien:

Even if there were some doubt as to the correct construction of the statute, the doubt should be resolved in favor of the alien. As this Court has held, even where a punitive section is being construed:

"We resolve the doubts in favor of that construction because deportation is a drastic measure and at times the equivalent of banishment or exile, Delgadillo v. Carmichael, 332 U.S. 388, 68 S.Ct. 10, 92 L.Ed. 17. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty. To construe this statutory provision less generously to the alien might find support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used." Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433.

See also Barber v. Gonzales, 347 U.S. 637, 642–643, 74 S.Ct. 822, 98 L.Ed.

---

2. We must read statutes "literally" just as we must so read the opinions of courts. We do it everyday. It is only when a literal reading would lead to some absurdity or grotesquerie that we are free to do otherwise. Sturges v. Crowninshield, 17 U.S. (4 Wheat.) 70, 106–107 (1819). Otherwise, of course, we would be anticipating Orwell by exactly a decade, and could sympathize with More's Utopians, who would have no lawyers amongst them since they considered it our profession to disguise matters.

1000. The 1957 Act was not a punitive statute, and § 7 of that Act, now codified as § 241(f), in particular was designed to accomplish a humanitarian result. We conclude that to give meaning to the statute in the light of its humanitarian purpose of preventing the breaking up of families composed in part at least of American citizens, the conflict between the circuits must be resolved in favor of the aliens, and that the *Errico*, 9 Cir., 349 F.2d 541, decision must be affirmed and the *Scott*, 2 Cir. 350 F.2d 279, decision reversed.

385 U.S. at 225, 87 S.Ct. at 480.

In sum, the canons of construction applied by the Supreme Court in *Errico* are not conjectural but are explicit and support the position of the Reids here. I submit that the statute is clear and that no construction is necessary at all. In *Errico*, the Supreme Court avoided a literal reading of Section 241(f) because it would thwart the humanitarian purposes of the statute.[3] Here, a literal reading of the statute concededly supports the position of the Reids and fully comports with the humanitarian purposes of the legislation. I therefore fail to understand how *Errico* now compels a construction which would contort the plain language of the statute and thwart its humanitarian purposes.

The majority opinion appeals to the legislative history of Section 241(f) for support of the thesis that the congressional intent was not to waive the essential substantive or procedural steps to which an alien must submit in order to obtain a visa. Of course, legislative history is "a legitimate aid to the interpretation of a statute where its language is doubtful or obscure . . . . But when taking the act as a whole, the effect of the language used is clear to the court, extraneous aid like this can not control the interpretation." Wisconsin R. R. Comm'n v. Chicago, B. & Q. R. R., 257 U.S. 563, 589, 42 S.Ct. 232, 237–238, 66 L.Ed. 371 (1922) (citation deleted); accord, Holtzman v. Schlesinger, 484 F. 2d 1307, 1314 (2d Cir. 1973).

I find the language lucid but in any event I find nothing in the legislative history to support the suggested dichotomy. Section 241(f) by its terms applies to aliens who have "procured . . . entry into the United States by fraud or misrepresentation." This is the clause the majority has excised from the statute. The term "entry" into the United States is defined in 8 U.S.C. § 1101(a)(13). "The term 'entry' means *any* coming of an alien into the United States . . . ." (emphasis added). This definition does not say visa-bearing alien; it says any coming of an alien. The Reids' entry is within the statute and there is no ambiguity compelling resort to legislative history.

Moreover, the historical excursion in my view is fruitless. I have found nothing in the available legislative history to support the proposition now sought to be advanced by the majority. Even the emphasized language of Senator Eastland's statement set forth in the majori-

---

3. In addition, the Court stated that "the administrative authorities have consistently held that § 241(f) waives any deportation charge that results directly from the misrepresentation regardless of the section of the statute under which the charge was brought . . . ." 385 U.S. at 217, 87 S.Ct. at 476. In support of this statement the Court cited the opinion of the Board of Immigration Appeals in Matter of Y——, 8 I. & N. Dec. 143 (1959).

In Matter of Y——, the Board held that Section 7 of the 1957 Act required termination of the deportation proceedings where the alien had entered this country by mis-

representing himself as an American citizen and the ground for deportation was entry without inspection. In Matter of K——, 9 I. & N. Dec. 585 (1962), the Board reached a similar result under Section 241(f). The Board adhered to this position following the Supreme Court's decision in *Errico*, Matter of Lee, 13 I. & N. Dec. 214 (1967), but the Attorney General, overruling the Board, ordered Lee deported, 13 I. & N. Dec. 214, 218 (1969). The Ninth Circuit, however, did not find the Attorney General's opinion persuasive and reversed. Lee Fook Chuey v. INS, 439 F.2d 244 (1971).

ty opinion refers to fraudulent misrepresentations in connection with visa applications *or* admission into the United States. Aside from the total silence with respect to any design to reserve the protection of the statute to visa-bearing aliens, there is language in the legislative history which the Supreme Court referred to in *Errico* [4] indicating that the principal beneficiaries of the law were Mexican nationals who were able to avoid border restrictions. If the Congress had in mind the so-called "wet back", entrants, then it is difficult to comprehend that it intended only visa-carrying entrants.[5] In short, I see no evidence of any congressional intent at odds with the clear language of the statute. As Judge Friendly observed about the majority position in his dissenting opinion in Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 491 (2d Cir. 1960): "[T]he voice so audible to them is silent to me."

Aside from this, I cannot accept the argument that the Reids here, by the "brazen" statement that they were citizens of the United States, thus frustrated the screening processes of INS. If they are this porous, then the solution is a tightened security and not the mutilation of Section 241(f).

The argument of the majority that 8 U.S.C. § 1225(a) supports the position that Congress intended to limit the benefits of Section 241(f) only to those aliens who admitted alienage, is not persuasive. While Section 1225(a) does not mandate the interrogation of returning United States citizens, the section does provide in part that "any immigration officer . . . shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of *any alién or person he believes or suspects to be an alien to enter, reenter, pass through, or reside in the United States . . . ."* (emphasis added). See also United States ex rel. Lapides v. Watkins, 165 F.2d 1017 (2d Cir. 1948). Moreover, the pertinent INS regulation, 8 C.F.R. § 235.-1(b), provides:

*U.S. citizens.* A person claiming U.S. citizenship must establish that fact to the examining immigration of-

---

4. The Supreme Court stated:
The only specific reference to the part of § 7 that deals with close relatives of United States citizens or residents is in the House Committee Report, and it says only that most of the persons eligible for relief would be

"Mexican nationals, who, during the time when border-control operations suffered from regrettable laxity, were able to enter the United States, establish a family in this country, and were subsequently found to reside in the United States illegally." H.R.Rep.No.1199, 85th Cong. 1st Sess. p. 11.

Without doubt most of the aliens who had obtained entry into the United States by illegal means were Mexicans, because it has always been far easier to avoid border restrictions when entering from Mexico than when entering from countries that do not have a common land border with the United States. There is nothing in the Committee Report to indicate that relief under the section was intended to be restricted to Mexicans, however. Neither does it follow that, because Mexicans are not subject to quota restrictions, therefore nationals of countries that do have a quota must be within the quota to obtain relief. 385 U.S. 223–224, 87 S.Ct. 479–480.

5. Since *Errico*, surreptitious entrants have been held not to be within Section 241(f). However, Monarrez-Monarrez v. INS, 472 F.2d 119 (9th Cir. 1972), and Gambino v. INS, 419 F.2d 1355 (2d Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2195, 26 L.Ed.2d 559 (1970), cited by the majority as "functionally" similar to the circumstances of this case and inconsistent with *Lee Fook Chuey*, are readily distinguishable. *Gambino* involved a "stowaway," which this court considered to be a special type of alien, and moreover, at the time of his entry (1921) Gambino was excludable as a stowaway. Judge Smith termed the part of the legislative history relating to Mexicans as "ambiguous." The INS in its brief here employs the same adjective. In any event, the courts have disregarded it since it does conflict with the language of the statute. Accordingly, in *Monarrez-Monarrez*, a surreptitious entry (concealment in an auto trunk) was not considered by the court to be entry gained by "fraud or misrepresentation," and on this basis the court distinguished *Lee Fook Chuey*.

ficer's satisfaction and must present a U.S. passport if such passport is required under the provisions of 22 CFR Part 53. *If such an applicant for admission fails to satisfy the examining immigration officer that he is a U.S. citizen, he shall thereafter be inspected as an alien.* (emphasis added).

See also 8 U.S.C. § 1323(a); Gordon & Rosenfield, Immigration Law & Procedure § 3.2 (1973).

It is also significant that 8 U.S.C. § 1361 cited by the majority as part of the screening process permitting the detention of aliens and casting upon them the burden of proving admissibility is not limited to visa applicants. It provides:

> Whenever any person makes application for a visa or any other document required for entry, or *makes. application for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person* . . . . (emphasis added).

In short, INS is not helpless in the face of a claim by an alien that he is a United States citizen. If he is suspected of being an alien, he must be inspected as an alien. I fail to see how recourse to Sections 1225(a) or 1361 advances the position of the majority by a jot or a tittle.[6] The blunder[7] of the constable here results, in effect, in the deportation of the petitioners as well as their native-born American sons.

I indeed agree that an alien who applies for a visa in advance of his entry into the United States is more readily investigated than one who poses as an American citizen at the point of entry. But this point is not raised in the legislative history and is not mentioned in the statute.[8] The administrative inconvenience to INS in making a *post hoc* investigation of the Reids' qualitative admissibility is *de minimis*, in my view, in contrast to what the dismissal of this petition accomplishes.

Mr. and Mrs. Reid are both gainfully employed in this country, have never been arrested since arriving and belong to no subversive organizations. There is no hint or suggestion that they are or have been qualitatively deficient in any of the categories mentioned by the majority. They have, moreover, become the parents of two native-born American boys who, by reason of their infancy (now ages 2 and 4), have no alternative but involuntary exile. The sins of the father are now literally visited upon the sons. I had thought that this was what the statute was designed to avoid.

At his deportation hearing, the petitioner Reid was asked if he had any-

6. The quarantine inspection provided for in 42 C.F.R. §§ 71.136 to 71.141 and referred to in the majority opinion is applicable to persons entering the United States and is not limited to aliens. Even 42 C.F.R. Part 34 providing for medical examination of aliens applies to all aliens not simply visa applicants.

7. The precise nature of the fraud employed here at entry is not clear. The Reids represent that "[a]t the time of their entry each of them, in response to a question from the Immigration Officer on duty, indicated that he was an American citizen, either by an affirmative answer or by remaining silent." The INS has not challenged this representation.

8. Ben Huie v. INS, 349 F.2d 1014 (9th Cir. 1965), relied upon by the majority involves 8 U.S.C. § 1251(a)(2) which in substance authorizes the deportation of aliens who enter the United States without inspection. The alien there apparently did not qualify under Section 241(f) which is in issue here. The Ninth Circuit's later opinion in *Lee Fook Chuey* makes the proper distinction. 439 F.2d at 249. See also Cabuco-Flores v. INS, 477 F.2d 108, 110–111 (9th Cir. 1973), which indicates that Section 241(f) is determinative. Goon Mee Heung v. INS, 380 F. 2d 236 (1st Cir.), cert. denied, 389 U.S. 975, 88 S.Ct. 479, 19 L.Ed.2d 470 (1967), also relied upon in the majority opinion, involves a request for adjustment of status under 8 U. S.C. § 1255 and again does not mention Section 241(f) which is in issue here. The distinction between deportation which involves humanitarian considerations and adjustment of status or naturalization was made by this court in Yik Shuen Eng v. INS, 464 F.2d 1265, 1267–1268 (2d Cir. 1972).

thing to say before the proceedings were closed. His answer was:

> I have got something to say, but I don't know whether it's going to make any difference. On the back of the form you say to show reason why you should not be deported. We have plenty reason why we shouldn't be deported. For one we have two kids and if we are deported we ain't got no home to go back to. Everything we had was abandoned. Taking two kids back there like sending two kids to die from malnutrition.

Even if the statute were ambiguous, I think it should be construed in favor of the Reids and their infant native-born sons. Where they are literally within its protection, as the majority admits, recourse to a supposed principle of construction which makes clear language suspect is neither convincing nor persuasive. I believe there is "plenty reason" to set aside the order of deportation and I emphatically dissent from the holding of the majority.